HAUENSTEIN *v.* LYNHAM.

1. In the absence of proof that an alien has become a citizen of the United States, his original status is presumed to continue.

2. A., a citizen of Switzerland, died in 1861 in Virginia intestate and without issue. For want of an heir capable under the statutes of the State to inherit the lands there situate whereof he died seised in fee, they were sold by the escheator of the proper district. A.'s next of kin, B., a citizen of Switzerland, filed a petition to recover the proceeds of that sale. Upon consideration of the treaty between the United States and the Swiss Confederation of Nov. 25, 1850 (10 Stat. 587), — *Held,* 1. That the treaty is the supreme law of the land, and by its terms the incapacity of B. as an alien was so far removed as to entitle him to recover and sell the lands and "withdraw and export the proceeds thereof." 2. That his rights thus secured are not barred by the lapse of time, inasmuch as no statute of Virginia prescribes the term within which they must be asserted. 3. That where a treaty admits of two constructions, — one restrictive as to the rights that may be claimed under it, and the other liberal, — the latter is to be preferred. 4. That the treaty-making clause of the Constitution is retroactive as well as prospective. 5. That, in view of B.'s rights in the premises, the escheator is entitled only to the amount allowed by law for making sales of real estate in ordinary cases. 6. That counsel cannot be paid out of the fund in dispute.

ERROR to the Supreme Court of Appeals of the State of Virginia.

The facts are stated in the opinion of the court.

*Mr. William L. Royall* for the plaintiff in error.

*Mr. James G. Field*, Attorney-General of Virginia, and *Mr. J. A. Lynham, contra.*

MR. JUSTICE SWAYNE delivered the opinion of the court.

Solomon Hauenstein died in the city of Richmond in the year 1861 or 1862, intestate, unmarried, and without children. The precise date of his death is not material. At that time, he owned and held considerable real estate in the city of Richmond. An inquisition of escheat was prosecuted by the escheator for that district. A verdict and judgment were rendered in his favor. When he was about to sell the property, the plaintiffs in error, pursuant to a law of the State, filed their petition, setting forth that they were the heirs-at-law of the deceased, and praying that the proceeds of the sale of the property should be paid over to them. Testimony was

taken to prove their heirship as alleged, but the court was of opinion that, conceding that fact to be established, they could have no valid claim, and dismissed the petition. They removed the case to the Court of Appeals. That court, entertaining the same views as the court below, affirmed the judgment. They thereupon sued out this writ of error.

The plaintiffs in error are all citizens of Switzerland. The deceased was also a citizen of that country, and removed thence to Virginia, where he lived and acquired the property to which this controversy relates, and where he died. The validity of his title is not questioned. There is no proof that he denationalized himself or ceased to be a citizen and subject of Switzerland. His original citizenship is, therefore, to be presumed to have continued. Best on Presumptions, 186. According to the record his domicile, not his citizenship, was changed. The testimony as to the heirship of the plaintiffs in error is entirely satisfactory. There was no controversy on this subject in the argument here. The parties were at one as to all the facts. Their controversy was rested entirely upon legal grounds.

The common law as to aliens, except so far as it has been modified by her legislature, is the local law of Virginia. 2 Tucker's Blackst., App., Note C. By that law " aliens are incapable of taking by descent or inheritance, for they are not allowed to have any inheritable blood in them." 2 Bla. Com., 249. But they may take by grant or devise though not by descent. In other words, they may take by the act of a party, but not by operation of law ; and they may convey or devise to another, but such a title is always liable to be devested at the pleasure of the sovereign by office found. In such cases the sovereign, until entitled by office found or its equivalent, cannot pass the title to a grantee. In these respects there is no difference between an alien friend and an alien enemy. *Fairfax's Devisee* v. *Hunter's Lessee*, 7 Cranch, 603.

The law of nations recognizes the liberty of every government to give to foreigners only such rights, touching immovable property within its territory, as it may see fit to concede. Vattel, book 2, c. 8, sect. 114. In our country, this authority is primarily in the States where the property is situated.

The Revised Code of Virginia of 1860, c. 115, sect. 1, provides that an alien upon declaring on oath before a court of record that he intends to reside in the State, and having the declaration entered of record, may inherit or purchase and hold real estate there as if he were a citizen.

Sect. 2 of the same chapter provides that such alien may convey or devise his real estate, and if he shall die intestate that it shall descend to his heirs, and if the alienee, devisee, or heir shall be an alien, that he may take and hold, by being in the State and making under oath and having recorded, within five years, a like declaration with that prescribed by the preceding section.

The sixth section declares that when by a treaty between the United States and any foreign country a citizen of such country is allowed to sell real estate in Virginia, he may sell and convey within the time prescribed by the treaty; and when by such treaty citizens of the United States are allowed to inherit, hold, sell, and convey real estate situate in such country, the citizens and subjects of that country may in like manner inherit, hold, sell, and convey real estate lying in Virginia, provided that these several provisions shall apply only to real estate acquired thereafter by the citizens or subjects of such foreign country.

Sect. 2 has no application to the present case, because the declaration which it permits has not been made by the plaintiffs in error, and sect. 6 has none, because all the real estate of the deceased was acquired before the date of the act.

The Revised Code of 1873 has obliterated nearly all the distinctions between aliens and citizens with respect to their rights as to both real and personal property. See c. 4, sect. 18, p. 130, and c. 119, sects. 4 and 10; pp. 917, 918. As it is not claimed that any of these provisions affect the present case, we shall pass them by without further remark.

This brings us to the consideration of the treaty between the United States and the Swiss Confederation, of the 25th of November, 1850. 11 Stat. 587. The fifth article has been earnestly pressed upon our attention, and is the hinge of the controversy between the parties.

The first part of the article is devoted to personal property,

and gives to the citizens of each country the fullest power touching such property belonging to them in the other, including the power to dispose of it as the owner may think proper. It then proceeds as follows : —

"The foregoing provisions shall be applicable to real estate situate within the States of the American Union, or within the cantons of the Swiss Confederation, in which foreigners shall be entitled to hold or inherit real estate.

"But in case real estate situated within the territories of one of the contracting parties should fall to a citizen of the other party, who, on account of his being an alien, could not be permitted to hold such property in the State or in the canton in which it may be situated, there shall be accorded to the said heir, or other successor, such term as the laws of the State or canton will permit to sell such property; he shall be at liberty at all times to withdraw and export the proceeds thereof without difficulty, and without paying to the government any other charges than those which, in a similar case, would be paid by an inhabitant of the country in which the real estate may be situated."

The plaintiffs in error are exactly within the latter category. This is too clear to require discussion. A corresponding provision for like cases is found in article 2, in the previous treaty of the 18th of May, 1847, between the same parties. 9 Stat. 902. By that article it is declared " that if, by the death of a person owning real property in the territory of one of the high contracting parties, such property should descend, either by the laws of the country or by testamentary disposition, to a citizen of the other party, who, on account of his being an alien, could not be permitted to retain the actual possession of such property, a term of not less than three years shall be allowed him to dispose of such property and collect and withdraw the proceeds thereof, without paying to the government any other charges than those which, in a similar case, would be paid by an inhabitant of the country in which such real property may be situated."

It was clearly the intention of the clause in question in the treaty of 1850 to secure to the beneficiaries absolutely the right " to sell said property," and " to withdraw and export the proceeds thereof without difficulty." Otherwise the language used

is a sham and a mockery. The only qualification is as to the time within which the right must be exercised. It has been earnestly contended, in behalf of the defendant in error, that the State, having fixed no time within which this must be done, it cannot be done at all, and that the entire provision thus becomes a nullity, and is as if it were not.

The terms of the limitation imply clearly that *some time*, and not that *none*, was to be allowed. If it had been proposed to those who negotiated the treaty to express in it the effect of this construction in plain language, can it be doubted that it would have been promptly rejected by both sides as a solecism and contrary to the intent of the parties?

Where a treaty admits of two constructions, one restrictive as to the rights, that may be claimed under it, and the other liberal, the latter is to be preferred. *Shanks* v. *Dupont*, 3 Pet. 242. Such is the settled rule in this court.

It was well remarked in the able opinion of the dissenting judge in the Court of Appeals, that if this case were to be decided under the treaty of 1847, there could not be a doubt as to the result. In this we concur, and we think the case is equally clear under the treaty of 1850, which governs the rights of the parties.

The provision as to time in the earlier treaty is, in effect, a statute of limitation. It applied with Procrustean sameness in all the States and in all the cantons. In the latter treaty this limitation was dropped, and the time was to be such " as the laws of the State or canton will permit." In other words, it was left to the laws of the several States and cantons respectively to fix the limitation in this as in other cases. This was consonant to the policy of our judiciary act of 1789, which gave to the State statutes of limitation the same effect in the local courts of the United States which they had in the courts of the States respectively that enacted them. The Procrustean uniformity prescribed by the former treaty was thus abandoned, and it is fair to presume that the harmonious results in this respect which must necessarily follow, everywhere within the territory covered by the treaty, both at home and abroad, were the considerations by which those who made the change were animated. If a State or canton had a law which imposed a

limitation in this class of cases, nothing more was necessary. If it had not such a law, it was competent to enact one, and until one exists there can be no bar arising from the lapse of time. A party entitled can sue whenever he chooses to do so, and he is clothed with all the rights of any other litigant asserting a claim where there is no statute of limitation applicable to the case. This we understand to be the position of Virginia, and such are the legal consequences necessarily flowing from it.

This construction of the treaty derives support from the fact that the treaty provides (sixth article) that any controversy which may arise among the claimants to the succession, " shall be decided according to the laws and by the judges of the country where the property is situated."

It remains to consider the effect of the treaty thus construed upon the rights of the parties.

That the laws of the State, irrespective of the treaty, would put the fund into her coffers, is no objection to the right or the remedy claimed by the plaintiffs in error.

The efficacy of the treaty is declared and guaranteed by the Constitution of the United States. That instrument took effect on the fourth day of March, 1789. In 1796, but a few years later, this court said : " If doubts could exist before the adoption of the present national government, they must be entirely removed by the sixth article of the Constitution, which provides that ' all treaties made or which shall be made under the authority of the United States, shall be *the supreme law of the land*, and the judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding.' There can be no limitation on the power of the people of the United States. By their authority the State Constitutions were made, and by their authority the Constitution of the United States was established; and they had the power to change or abolish the State Constitutions or to make them yield to the general government and to treaties made by their authority. A treaty cannot be *the supreme law of the land*, that is, of all the United States, if any act of a State legislature can stand in its way. If the Constitution of a State (which is the fundamental law of the State and paramount to its legislature) must give way to a treaty and fall

before it, can it be questioned whether the less power, an act of the State legislature, must not be prostrate? It is the declared will of the people of the United States that every treaty made by the authority of the United States shall be superior to the Constitution and laws of any individual State, and their will alone is to decide. If a law of a State contrary to a treaty is not void, but voidable only, by a repeal or nullification by a State legislature, this certain consequence follows, — that the will of a small part of the United States may control or defeat the will of the whole." *Ware* v. *Hylton*, 3 Dall. 199.

. It will be observed that the treaty-making clause is retroactive as well as prospective. The treaty in question, in *Ware* v. *Hylton*, was the British treaty of 1783, which terminated the war of the American Revolution. It was made while the Articles of Confederation subsisted. The Constitution, when adopted, applied alike to treaties " made and to be made."

We have quoted from the opinion of Mr. Justice Chase in that case, not because we concur in every thing said in the extract, but because it shows the views of a powerful legal mind at that early period, when the debates in the convention which framed the Constitution must have been fresh in the memory of the leading jurists of the country.

In *Chirac* v. *Chirac* (2 Wheat. 259), it was held by this court that a treaty with France gave to her citizens the right to purchase and hold land in the United States, removed the incapacity of alienage and placed them in precisely the same situation as if they had been citizens of this country. The State law was hardly adverted to, and seems not to have been considered a factor of any importance in this view of the case. The same doctrine was reaffirmed touching this treaty in *Carneal* v. *Banks* (10 id. 181), and with respect to the British treaty of 1794, in *Hughes* v. *Edwards* (9 id. 489). A treaty stipulation may be effectual to protect the land of an alien from forfeiture by escheat under the laws of a State. *Orr* v. *Hodgeson*, 4 id. 453. By the British treaty of 1794, " all impediment of alienage was absolutely levelled with the ground despite the laws of the States. It is the direct constitutional question in its fullest conditions. Yet the Supreme Court held that the stipulation was within the constitutional powers of the Union.

*Fairfax's Devisees* v. *Hunter's Lessee*, 7 Cranch, 627 ; see *Ware* v. *Hylton*, 3 Dall. 242." 8 Op. Att'ys-Gen. 417. Mr. Calhoun, after laying down certain exceptions and qualifications which do not affect this case, says : " Within these limits all questions which may arise between us and other powers, be the subject-matter what it may, fall within the treaty-making power and may be adjusted by it." Treat. on the Const. and Gov. of the U. S. 204.

If the national government has not the power to do what is done by such treaties, it cannot be done at all, for the States are expressly forbidden to " enter into any treaty, alliance, or confederation." Const., art. 1, sect. 10.

It must always be borne in mind that the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution. This is a fundamental principle in our system of complex national polity. See also *Shanks* v. *Dupont*, 3 Pet. 242 ; *Foster & Elam* v. *Neilson*, 2 id. 253 ; *The Cherokee Tobacco*, 11 Wall. 616 ; Mr. Pinkney's Speech, 3 Elliot's Constitutional Debates, 231 ; *The People, &c.* v. *Gerke & Clark*, 5 Cal. 381.

We have no doubt that this treaty is within the treaty-making power conferred by the Constitution. And it is our duty to give it full effect. We forbear to pursue the topic further. In the able argument before us, it was insisted upon one side, and not denied on the other, that, if the treaty applies, its efficacy must necessarily be complete. The only point of contention was one of construction. There are doubtless limitations of this power as there are of all others arising under such instruments ; but this is not the proper occasion to consider the subject. It is not the habit of this court, in dealing with constitutional questions, to go beyond the limits of what is required by the exigencies of the case in hand. What we have said is sufficient for the purposes of this opinion.

During the argument here, our attention was called to the amount that might be taken from the fund for compensation to the escheator and to his counsel in the event of our judgment being in favor of the plaintiffs in error.

Under the circumstances, the escheator can have no claim as such, but he may properly receive the percentage allowed by

law for making sales of real property in ordinary cases. It is a settled rule in this court never to allow counsel on either side to be paid out of the fund in dispute.

The judgment of the Court of Appeals of Virginia, so far as it concerns the claim of the plaintiffs in error, will be reversed, and the cause remanded for further proceedings in conformity with this opinion; and it is

*So ordered.*