THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNAL EUBANKS, Defendant-Appellant.

First District (2nd Division)   Nos. 1—94—2285, 1—94—2754 cons.

Opinion filed August 13, 1996.

14

Michael Pelletier and Debra Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter Fischer, and Elizabeth Scholz, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:[1]

Defendant Vernal Eubanks, codefendant Brian Robinson, and two others were charged with numerous offenses resulting from the robbery and shooting of Leonard Macon. Defendant and Robinson were tried before two separate juries, and the other two suspects pled guilty. A jury found defendant guilty of aggravated battery with a firearm and armed robbery, but acquitted him of attempted murder. Defendant appeals, raising as issues whether (1) he was proved guilty of the charges beyond a reasonable doubt; (2) the circuit court erred in failing to conduct a fitness hearing; and (3) the circuit court erred in sentencing him.

Leonard Macon testified that on December 17, 1992, at 3 p.m., he was walking along 14th Place when a gray car with four occupants stopped about 15 yards from him. Brian Robinson, whom Macon knew from the neighborhood, exited the car and went into a house

---

[1]Although this is a consolidated appeal, the appeal stems only from the trial of Vernal Eubanks. The appeal was consolidated because two notices of appeal were filed in the circuit court and two appeal numbers inadvertently were assigned to this case.

adjacent to an alley. Robinson returned to the car and pulled up alongside Macon. The four occupants, identified by Macon as Robinson, defendant, Gerald Taylor, and Sammy "Shine" McGruder, approached him. Robinson pulled out a .38-caliber handgun and asked Macon where his roommate George "Butch" Addison was; Macon responded that he did not know. Defendant then punched Macon on the side of the face, knocking off his eyeglasses. Robinson spoke of killing Macon, but instead told him to hand over his money. Macon responded that he had no money. Robinson then demanded his leather jacket. Macon took off his jacket, and McGruder took it. Taylor and defendant stood near McGruder.

The four men then took Macon through a vacant lot to an alley located north of 14th Place. Robinson had his gun pointed at Macon the entire time. In the presence of defendant and the other two, Robinson directed Macon to go into a vacant garage, which Macon entered. Macon started walking briskly when he saw a door in the back of the garage, but halfway through, Macon heard three gunshots and felt two shots hit him in the back. Macon ran out of the garage door towards 14th Place. When Macon saw the four perpetrators running through the vacant lot, he turned around and ran to his home on 14th Street, north of the alley. Once inside his house, Macon saw the perpetrators drive past his home. When they were gone he ran to his neighbor Shirley Brown's home, where he fell to the floor. She called the police and the paramedics. Macon provided information to the police and was taken to the hospital. Macon admitted that he had been convicted for forgery, for which he received 24 months' probation.

On cross-examination, Macon stated, among other things, that defendant was not carrying a gun.

Chicago police officer Thomas Newton testified that on December 17, 1992, he responded to a report of a shooting. There he saw Macon lying on the floor of Brown's home. Newton saw blood and noticed that Macon had been shot. Macon said that Robinson shot him. Newton went to the garage where the shooting occurred and found a trail of blood.

Chicago police officer Andre Hasan testified that on December 20, 1992, he arrested defendant and took his photographs. These were shown to Macon along with other random photos, and he identified defendant.

At the conclusion of the State's case in chief, defendant testified that he has a twin brother, Bernal, and they both have the nickname "Twin." He knew Robinson, McGruder, Taylor, Macon, and Addison from the neighborhood.

On December 17, 1992, at 3 p.m., outside of a liquor store with some friends, he was talking to his girlfriend on the telephone when he heard gunshots coming from somewhere between 14th Place and 14th Street. He and his friends went to 14th Place and Ashland, where he saw a car speed away, but did not see any of the passengers.

Defendant stated that on the day of the shooting, he had not been getting along with McGruder because McGruder had shot at him. He denied planning with McGruder or Robinson to shoot someone. Defendant denied punching Macon or knocking off his glasses or entering Robinson's car on the day of the shooting or being present when Macon was held at gunpoint. He denied seeing Macon or Robinson on the day of the shooting.

Defendant spoke to a detective at the police station during the early morning hours of December 21, 1992, but denied telling him he was in an alley with Robinson on December 17 or that he was standing five feet from Robinson while Robinson pointed a gun at Macon.

Chicago police officer Deborah Dorken testified that when she talked to Macon at Brown's home and the hospital, the only name he gave was the shooter, Robinson.

In rebuttal, Chicago police detective Michael Hughes testified that at 2 a.m. on December 21, 1992, he interviewed defendant, in custody, who admitted he was in an alley near 14th Place with Taylor at 3 p.m. on December 17, 1992. He was about five feet from Robinson, who was pointing a gun at Macon. Defendant told Robinson not to shoot Macon.

At the close of the evidence and after closing argument, the jury was instructed upon the theory of accountability and found defendant not guilty of attempted murder, but guilty of aggravated battery with a firearm and armed robbery. The circuit court sentenced him to 12 years' imprisonment for aggravated battery with a firearm and, concurrently, 12 years for armed robbery. Defendant timely filed a notice of appeal.

I

Defendant first contends that he was not proved guilty beyond a reasonable doubt of aggravated battery with a firearm and armed robbery.

■ The standard of review for challenging the sufficiency of evidence is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979); *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985).

The determination of the trier of fact will not be set aside on review unless the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307, 537 N.E.2d 317 (1989).

■ Under Illinois law, a person is legally accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1992). In *People v. Taylor*, 164 Ill. 2d 131, 140-41, 646 N.E.2d 567 (1995), our supreme court explained:

> "Mere presence of a defendant at the scene of a crime does not render one accountable for the offense. [Citations.] Moreover, presence at the scene plus knowledge that a crime was being committed, without more, is also insufficient to establish accountability. [Citation.] Nevertheless, active participation has never been a requirement for the imposition of criminal guilt under an accountability theory. [Citation.] One may aid and abet without actively participating in the overt act. [Citation.]
>
> A defendant may be deemed accountable for acts performed by another if *** there was a common criminal plan or purpose. [Citations.] Words of agreement are not necessary to establish a common purpose to commit a crime. The common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. [Citations.] Proof that defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. [Citation.] Defendant's flight from the scene may also be considered in determining whether defendant is accountable. [Citation.]"

With the foregoing as frames of reference, defendant's specific arguments will be considered.

## A

Defendant maintains that he cannot be held accountable for armed robbery where he had no interest in the coat taken, was not armed, said nothing to Macon, and was merely present.

■ Armed robbery occurs when a person, while armed with a dangerous weapon, takes property from the person or presence of another by the use of force or by threatening the imminent use of force. 720 ILCS 5/18—2(a) (West 1992).

■ Viewing the evidence in the light most favorable to the prose-

cution, the jury could have believed that defendant, Robinson, Taylor, and McGruder were in a car together and pulled up next to Macon as he walked along the street. They approached Macon, and Robinson pulled out a gun. When Macon said he did not know the whereabouts of his roommate Butch, defendant punched him in the face. Robinson, at gunpoint, then told Macon to hand over his money and jacket. Defendant stood by and said nothing. McGruder took Macon's jacket, the four offenders led Macon to the vacant garage, and he was shot.

A rational trier of fact could conclude that defendant aided his coconspirators in the commission of the armed robbery. Defendant, along with the three others, created an atmosphere of coercion and intimidation. It was he who punched Macon, stood by and remained with the group after the coat was taken, was present at and fled from the scene after the shooting, and never reported the crime to the police. All the foregoing factors could have been considered in determining that defendant was accountable for the actions of his cohorts. See *Taylor*, 164 Ill. 2d at 140-41.

Defendant was proved guilty beyond a reasonable doubt of armed robbery.

### B

Defendant asserts that he was not accountable for aggravated battery with a firearm where the facts indicate he was not armed, he had no agreement with Robinson to shoot anyone and, according to Detective Hughes, he told Robinson not to shoot Macon.

■ Aggravated battery with a firearm occurs when a person, in committing a battery, knowingly causes any injury to another by means of the discharging of a firearm. 720 ILCS 5/12—4.2(a) (West 1992).

Here, the evidence, when viewed in the light most favorable to the prosecution, showed that the four offenders directed Macon into a vacant garage near the alley. As Macon was led into the alley, he glanced back and saw Robinson pointing the gun at him and also saw defendant walking along with them. When near the garage, Macon did not turn around, but heard voices. Defendant evidently anticipated a shooting because he claims to have told Robinson not to shoot Macon. Nevertheless, Robinson told Macon to walk into the vacant garage and, shortly thereafter, Macon was shot. Thereafter, Macon escaped through the garage door and saw the four offenders run away. Later, he saw them drive by his home.

Defendant cites three cases to support his argument that he was not accountable for Macon's shooting. In *People v. Green*, 26 Ill. App. 3d 662, 668, 325 N.E.2d 316 (1975), *aff'd in part & rev'd in part*, 62 Ill. 2d

146, 340 N.E.2d 9 (1975), the court concluded, with little analysis, that defendant could not be convicted of murder under an accountability theory where he and two others attempted to rob a passenger on a train and, as they were preparing to leave the train, one of the cohorts shot the passenger as he ran by them.[2] In *People v. Lincoln*, 157 Ill. App. 3d 700, 510 N.E.2d 1026 (1987), defendant went into the bedroom of his neighbor looking for a man named Mitchell, while his codefendants shot a man who was sitting in the living room. The court held that defendant was not accountable for murder because his plan was "to get" Mitchell, and defendant was not present during the events that led to the killing. *Lincoln*, 157 Ill. App. 3d at 706. In *People v. Estrada*, 243 Ill. App. 3d 177, 178-80, 611 N.E.2d 1063 (1993), defendant was riding in a car with three fellow gang members, knowing that one of them was carrying a semi-automatic weapon. They pulled up to a street corner and exchanged gang signs with members of an opposing gang. After defendant exited the car with a tire iron, someone in the car fired two shots. Defendant chased one of the opposing gang members and shattered a window of the building where the individual entered. The court held that defendant was not accountable for the murder of the individual killed by gunfire because when defendant left the car brandishing a tire iron, he was not aware that one of his companions would shoot the gun. *Estrada*, 243 Ill. App. 3d at 185. Here, defendant punched Macon, stood by as he was robbed, helped coerce him into the garage, knew there would be a shooting, fled with the other offenders after the shooting, and failed to notify the authorities. In addition, Macon was held at gunpoint the entire time, and Robinson threatened to kill him, but defendant said nothing.

The State refers to *People v. Terry*, 99 Ill. 2d 508, 515, 460 N.E.2d 746 (1984), where the court held that defendants could be held accountable for the murder of another although their sole intent may have been to beat the victim, since they knew that a third companion brought a knife and intended to kill the victim. In *Terry*, the court explained the "common-design rule," which is incorporated in the accountability statute and provides that where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts. 99 Ill. 2d at 514.

---

[2]Instead, defendant was found guilty of murder under the felony-murder rule. *Green*, 26 Ill. App. 3d at 668.

The *Terry* court discussed *Brennan v. People*, 15 Ill. 511 (1854), where the common-design rule was applied. In *Brennan*, a group of persons pursued a man named Story to a barn and killed him, although it was not clear who or why they killed him. In holding defendants guilty of murder, the court stated:

> "The [defendants] may be guilty of murder, although they neither took part in the killing, nor assented to any arrangement having for its object the death of Story. It is sufficient that they combined with those committing the deed to do an unlawful act, such as to *beat* or rob Story; and that he was killed in the attempt to execute the common purpose. If several persons conspire to do an unlawful act, and death happens in the prosecution of the common object, all are alike guilty of the homicide." *Brennan*, 15 Ill. at 516-17, quoted in *Terry*, 99 Ill. 2d at 514.

■ Defendant was accountable for the actions of Robinson. As in *Brennan*, where defendants chased Story into a barn, defendant and his companions here led Macon into an empty garage for an unknown purpose. Whatever their reason for taking Macon to the garage at gunpoint, it was unlawful. Defendant's own evidence suggests that he knew of an impending shooting. The fact that Macon was shot during the execution of the common purpose is sufficient to hold defendant accountable for the shooting. A rational trier of fact could have concluded that defendant was accountable for the shooting of Macon.

The cases cited by defendant are distinguishable. In *Green*, defendants were leaving the train, having already attempted to rob the victim, when one of the defendants shot the victim as he ran by. In *Lincoln*, the plan was to get Mitchell. Any consequence to Mitchell resulting from their plan to get him would have been attributable to defendant, but the death of a bystander went beyond the plan. In *Estrada*, there was no evidence that defendant had advance knowledge of the plan to kill the opposing gang member. *Estrada*, 243 Ill. App. 3d at 185. Because defendant exited the car brandishing a tire iron, there was no evidence that he and his cohort were in concert with respect to their thoughts or actions. Here, defendant stood by Robinson the entire time Macon was held at gunpoint.

Under the evidence produced in the present case, defendant was proved guilty beyond a reasonable doubt of aggravated battery with a firearm.

## II

Defendant next submits that the circuit court erred in not conducting a fitness hearing concerning his use of medication during trial. The presentence investigative report states that defendant's asthma condition required the use of a Ventolin inhaler.

22

■ Due process bars prosecution of a person who is not competent to stand trial. *People v. Kinkead*, 168 Ill. 2d 394, 407, 660 N.E.2d 852 (1995) (*Kinkead*). Fitness to stand trial refers to a defendant's ability "to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 104—10 (West 1992); *Kinkead*, 168 Ill. 2d at 407. "A defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." 725 ILCS 5/104—21(a) (West 1992).

When the requisites of section 104—21(a) are met, defendant is entitled to a fitness hearing as a matter of right. *Kinkead*, 168 Ill. 2d at 414. If defense counsel fails to request a fitness hearing, and the elements of section 104—21(a) are clearly satisfied, prejudice to defendant ordinarily will be presumed. *Kinkead*, 168 Ill. 2d at 411. Moreover, if the circuit court has notice that defendant is taking psychotropic medications, it has a duty to inquire into the matter and hold a hearing to determine whether defendant is fit to stand trial. *Kinkead*, 168 Ill. 2d at 411.

■ The State contends that Ventolin is not a psychotropic drug. Section 1—121.1 of the Mental Health and Developmental Disabilities Code (the Mental Health Code) defines "psychotropic medication" as "medication whose use for antipsychotic, antidepressant, antimanic, antianxiety, behavioral modification or behavioral management purposes is listed in AMA Drug Evaluations, latest edition, or Physician's Desk Reference [PDR], latest edition, or which are administered for any of these purposes." 405 ILCS 5/1—121.1 (West 1992).[3] The United States Supreme Court explained that psychotropic drugs are "medications commonly used in treating mental disorders such as schizophrenia," the effect of which is "to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind." *Washington v. Harper*, 494 U.S. 210, 214, 108 L. Ed. 2d 178, 193, 110 S. Ct. 1028, 1032 (1990).

The PDR describes the following uses for Ventolin: prevention and relief of bronchospasm in patients with reversible obstructive airway disease, prevention of exercise-induced bronchospasm, and relief of bronchospasm in patients with acute attacks of broncho-

---

[3]The Code of Criminal Procedure of 1963 implicitly adopts the provisions of the Mental Health Code: "In the event of any conflict between this Article and the [Mental Health Code], the provisions of this Article shall govern." 725 ILCS 5/104—29 (West 1992).

spasm. Physicians' Desk Reference 1197-98 (50th ed. 1996). There is no indication in the PDR that Ventolin is used for the purposes listed in the Mental Health Code. This conclusion is consistent with the Administrative Code relating to the Department of Mental Health and Developmental Disabilities, which lists 45 psychotropic drugs, but does not include Ventolin as such a drug. 59 Ill. Adm. Code § 112.80(c)(2) (1994). Ventolin simply is not a psychotropic drug.

Nevertheless, defendant insists that because Ventolin can be interpreted to fall under the definition of "other medications [taken] under medical direction," he should have been given a fitness hearing.

■ Section 104—21(a) requires a fitness hearing if a defendant "is receiving *psychotropic drugs or other medications* under medical direction." (Emphasis added.) 725 ILCS 5/104—21(a) (West 1992). Statutory construction principles require that a specific provision, when followed by a general provision, as in section 104—21(a), be read to control the general provision when both relate to the same subject matter, under the doctrine of *ejusdem generis. People v. Villarreal*, 152 Ill. 2d 368, 379, 604 N.E.2d 923 (1992). Further, when a statutory clause describes a class or classes of persons or things, and then includes "other" persons or things, as in "other medications under medical direction" following the specific reference to "psychotropic drugs" in section 104—21(a), the word "other" is interpreted to mean "other such like" (*People v. Lowey*, 271 Ill. App. 3d 929, 933-34, 649 N.E.2d 954 (1995); *People v. McBrien*, 144 Ill. App. 3d 489, 494-95, 494 N.E.2d 732 (1986)), in this case psychotropic drugs. The term "other medications" is not ambiguous, but must be interpreted in light of whether the medication impacts upon defendant's ability "to understand the nature and purpose of the proceedings against him or to assist in his defense." See 725 ILCS 104—10 (West 1992); *Kinkead*, 168 Ill. 2d at 407. The construction of the term "other medication," with reference to section 1—121.1, also provides some guidance as to the intent of the legislature.

From the foregoing, we conclude that the legislature never intended that a defendant's use of Ventolin required a fitness hearing. The circuit court did not err in this aspect of the case.

### III

Defendant argues that the circuit court erred in sentencing him because his sentence is disparate to the one imposed on Robinson and it was excessive in light of his rehabilitative potential.

Defendant was 17 years old at the time of the shooting. He was attending Cregier High School at the time of his arrest and was tak-

ing GED classes in jail. He was never married, but has two children, both of whom he is unable to support. During the summer prior to the shooting, he worked for the Mayor's Office of Employment and Training. He enjoyed swimming, playing basketball and football, and loved reading novels and attending movies. He had been a member of the Black Gangster street gang since he was 13, but had no prior adult convictions.

■ In fashioning appropriate sentences, the circuit court is in a far better position than a reviewing court because it can make a reasoned judgment based on firsthand consideration of factors such as defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Streit*, 142 Ill. 2d 13, 19, 566 N.E.2d 1351 (1991). A sentence will not be disturbed on review unless it greatly diverges from the purpose and spirit of the law or is highly disproportionate to the nature of the offense. *People v. Hall*, 273 Ill. App. 3d 838, 843, 652 N.E.2d 1266 (1995). Accordingly, the standard of review is whether the circuit court abused its discretion. *Hall*, 273 Ill. App. 3d at 843.

### A

The first part of defendant's argument is that his sentence is disparate to Robinson's sentence considering his degree of participation in the crimes and their criminal records. The State responds that defendant waived this issue because he did not raise it in his post-sentencing motion, and no record of Robinson's sentencing hearing or the circuit court's reasoning is before this court; there is no sentencing disparity because they were convicted of different crimes; and, assuming they were similarly situated, there were sufficient reasons for the disparate sentences.

Notwithstanding the fact that this argument was not raised in the post-sentencing motion, we elect to consider the argument on its merits in the interest of fairness and justice.

■ The State argues this court cannot review this question because there is no record of Robinson's sentencing hearing. We may take judicial notice of this court's records. *People v. Alexander*, 40 Ill. App. 3d 457, 460, 352 N.E.2d 245 (1976). Although the facts contained in Robinson's separate appeal are not contained in this record, subsequent to the filing of the State's brief, a supplemental record was filed in this case which contains Robinson's presentence investigation report and the report of proceedings for Robinson's sentencing hearing. Accordingly, we reject the State's argument that no record of Robinson's sentencing hearing is contained in this appeal.

■ Defendant's claim nevertheless fails because he and Robinson were convicted of different crimes. Similarly situated defendants should not receive grossly disparate sentences; however, parity in sentencing is not required for all participants in the same crime. *People v. Foster*, 199 Ill. App. 3d 372, 393, 556 N.E.2d 1289 (1990). The difference may be justified by the relative character and history of the codefendants, the degree of culpability, rehabilitative potential, or a more serious criminal record. *Foster*, 199 Ill. App. 3d at 393.

Robinson was convicted of attempted murder and aggravated battery with a firearm. Therefore, defendant and Robinson are not similarly situated because they were convicted of different crimes. *Foster*, 199 Ill. App. 3d at 393. Defendant's argument relative to disparate sentences is without merit. Assuming, *arguendo*, their sentences could be compared, Robinson received a longer sentence than defendant (14 years to 12 years).

The circuit court did not abuse its discretion.

## B

The second part of defendant's sentencing argument is that his sentence was excessive in light of his rehabilitative potential. The State counters that defendant's sentences for armed robbery and aggravated battery with a firearm should be ordered to run consecutively, rather than concurrently, since it is mandated by statute. See 730 ILCS 5/5—8—4(a) (West 1992). Alternatively, the State maintains there was no abuse of discretion.

The sentence for armed robbery and aggravated battery with a firearm, both of which are Class X felonies, must be between 6 and 30 years. 720 ILCS 5/12—4.2(b), 18—2(b) (West 1992); 730 ILCS 5/5—8—1(a)(3) (West 1992). The circuit court sentenced defendant to concurrent 12-year terms. The sentence was not excessive.

■ The circuit court's imposition of concurrent sentences indicates the court's belief that the instant offenses did not occur in a single course of conduct and, therefore, the mandatory consecutive sentence provisions of section 5—8—4(a) were not applicable. The record shows that after the initial course of the armed robbery, a new objective developed, that of Robinson telling Macon to begin walking and then Robinson shooting and attempting to murder him. Without a single course of conduct, the mandatory consecutive sentence provisions do not apply. *People v. Arna*, 168 Ill. 2d 107, 112, 658 N.E.2d 445 (1995). The imposition of concurrent sentences was supported by the evidence and was not an abuse of discretion. *People v. Peebles*, 125 Ill. App. 3d 213, 223, 465 N.E.2d 539 (1984).

26

For the reasons set forth above, there are no bases for disturbing the circuit court proceedings and, accordingly, we affirm.

Affirmed.

SCARIANO and BURKE, JJ., concur.