FOURTH DIVISION
FEBRUARY 22, 2007

No. 1-05-0845

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 9450 (04) |
| | ) | |
| OSCAR MARTINEZ, | ) | Honorable |
| | ) | Dennis A. Dernbach, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial, the circuit court of Cook County found defendant Oscar Martinez guilty of armed robbery and sentenced him to 20 years in prison. Defendant now appeals, arguing that: (1) the trial court erred in failing to suppress his statements to the police, despite the State's failure to notify him of his right to contact the Mexican consulate; (2) the trial court erred in failing to suppress his statements to the police, where the Miranda warnings were not completely given; and (3) the trial court abused its discretion in sentencing him to 20 years in prison, when a codefendant was sentenced to 10 years for the same offense.

The following facts are relevant to this appeal. On February 13, 2000, Frederick Jamison was fatally shot in the head in connection with a faked drug transaction and arranged robbery. In the transaction, a group of men lured Frederick and others to a specified location on the premise of selling them a large quantity of marijuana and then robbed Frederick and the others of the

money while pretending to be police officers.  Martinez was to bring fake marijuana to the location, with his appearance being a signal to begin the robbery.

Defendant was taken into custody on February 13, 2000, and later charged in a 38-count indictment for felony murder based on aggravated vehicular hijacking and felony murder based on armed robbery; and also with five counts for the armed robbery and aggravated vehicular hijacking of Roderick Jamison, Corey Brown, John Smith, Jonathan Stevenson and Leroy Presley.  Maurice Taylor, Ventura Alvarez, George Rivera, Gilbert Roman, David Guevara and Alvin Harris were charged as codefendants.[1]

Prior to trial, defendant filed motions challenging the admissibility of statements he made to police: an oral statement to Chicago police detectives Velez and Rodriguez; an oral statement to Chicago police detective Velez and Assistant State's Attorney Stevens; an oral statement to Chicago police sergeant Pena and Assistant State's Attorney Luis Martinez; and a written statement to Chicago police sergeant Pena and Assistant State's Attorney Martinez.  Defendant's first motion alleged that the police failed to properly give him  the Miranda warnings, particularly given that defendant was not fluent in the English language.  Defendant's second motion repeated these alleged failings, adding that the State's interrogations violated the terms of the Vienna

---

[1] This appeal does not address the cases of codefendants.  Taylor's appeal was disposed of in a nonpublished order (No. 1-04-0239, June 24, 2005); Roman's appeal was dismissed on his own motion (No. 1-04-2493, February 23, 2006); Rivera's appeal was disposed of in a nonpublished order (No. 1-04-2164, November 16, 2006).  This court has no information regarding the appeals, if any, of the remaining defendants.

Convention on Consular Relations (Vienna Convention on Consular Relations, opened for signature April 24, 1963, art. 36, 21 U.S.T. 77, 596 U.N.T.S. 261).

At a hearing on the Miranda motion, the State called Detectives Velez and Pena as witnesses. Detective Velez testified that on February 14, 2000, he and his partner interrogated defendant. Detective Velez testified that he is fluent in Spanish. Detective Velez did not have a Spanish Federation of Police book or any form containing the Miranda warnings in Spanish. Detective Velez testified that at the start of the first interrogation he advised defendant in Spanish that he had the right to remain silent, that anything he said could be used against him, that he had the right to an attorney, and that if he could not afford one, an attorney would be appointed. Defendant then agreed to speak and gave an inculpatory statement to the police.

Detective Velez testified that on February 16, 2000, he acted as an interpreter for an interrogation of defendant by Assistant State's Attorney (ASA) Stevens. Detective Velez testified that he admonished defendant "the same way as [he] did it last time." Defendant again agreed to speak and gave an inculpatory statement to the police.

Sergeant Pena testified that she was asked to act as the translator for two interrogations of defendant by ASA Luis Martinez. Sergeant Pena testified that she is fluent in Spanish. Sergeant Pena testified that Spanish Miranda forms were not used. Sergeant Pena testified that she advised defendant that he had the right to remain silent, that anything he said could be used against him in a court of law, that he had the right to an attorney and have him present during any questioning, and that if he did not have money, an attorney would be appointed. Sergeant Pena admitted that she could not say whether those were the exact words used. Defendant's written statement was in English and was translated to Spanish by Sergeant Pena for defendant's signature.

The trial court denied defendant's <u>Miranda</u> motion.

At the hearing on defendant's other motion to suppress, defendant testified that he was born in Mexico City, Mexico, and had never been a citizen of the United States. The parties stipulated that during none of the four interrogations at issue did the police advise defendant that he had certain rights under the Vienna Convention, specifically the right to have someone from the consulate speak with him, the right to an attorney supplied by the consulate, and the right to have an impartial interpreter. The State so stipulated with the caveat that it did not believe defendant had a right to an impartial interpreter. The parties also stipulated that the police did not contact the consulate on their own to inform the consulate that defendant was in custody. Rita Vargas, who worked for the Mexican Consulate, testified that pursuant to the Vienna Convention, one of her functions was to explain to Mexican nationals differences in the United States and Mexican legal systems. Typically, Vargas would not tell nationals to remain silent, but would advise them to await an attorney.

The trial court denied the motion to suppress, ruling that defendant had no remedy under the Vienna Convention.

At the bench trial, defendant's inculpatory written statement was introduced into evidence. The State also called Roderick Jamison and John Smith as witnesses; their testimony regarding the offenses was similar to the account given in defendant's written statement. Both Roderick Jamison and John Smith identified defendant as the man who carried the bag of supposed marijuana into Ventura Alvarez's repair shop, where the robbery took place.

The trial court ultimately found defendant guilty of five counts of armed robbery, acquitting him on the remaining charges. The trial court then merged the armed robbery counts into one conviction. Following the denial of defendant's posttrial motion, the trial court

sentenced defendant to 20 years in prison. The trial court denied defendant's motion for reconsideration; this appeal followed.

I

This court first turns to address defendant's claim that the trial court erred in failing to suppress his statements to the police because the Miranda warnings were not completely given. In Miranda v. Arizona, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612 (1966), the Supreme Court held that before conducting a custodial interrogation, law enforcement officers must administer warnings to the defendant sufficient to inform him of his privilege against self-incrimination. The four essential elements of the warning that is required to be given to a defendant in custody before questioning are: (1) the defendant must be told of his right to remain silent; (2) that anything he says may be used against him; (3) that he has the right to have counsel present before and during questioning; and (4) that he is entitled to have counsel appointed if he cannot afford one. Miranda, 384 U.S. at 479, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630 ; California v. Prysock, 453 U.S. 355, 358-59, 69 L. Ed. 2d 696, 700-01, 101 S. Ct. 2806, 2809 (1981); United States v. Espinosa-Orlando, 704 F.2d 507, 514 (11th Cir. 1983).

However, the Supreme Court has never insisted that Miranda warnings be given in the exact form described in that opinion. Duckworth v. Eagan, 492 U.S. 195, 202, 106 L. Ed. 2d 166, 176, 109 S. Ct. 2875, 2880 (1989). The Miranda Court merely stated that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." (Emphasis added.) Miranda, 384 U.S. at 476, 16 L. Ed. 2d at 725, 86 S. Ct. at 1629; see also Prysock, 453 U.S. at 359, 69 L. Ed. 2d at 701, 101 S. Ct. at 2809 (per curiam) ("[N]o talismanic incantation [is] required to satisfy [Miranda's] strictures"). Nevertheless, Miranda

warnings must reasonably convey to a suspect his rights. Duckworth, 492 U.S. at 203, 106 L. Ed. 2d at 177, 86 S. Ct. at 2880.

In this case, defendant argues that the warnings were fatally defective because the State did not inform him that he had the right to have counsel present during questioning and the right to consult with counsel prior to questioning.

This court has held, however:

> "While the better practice would be for the police to make explicit that defendant's right to consult with a lawyer may be both before and during any police interrogation, we hold that the language used in this case was sufficient to imply the right to counsel's presence during questioning. We note that, as opposed to Duckworth, no restrictions were stated by the police in the present case as to how, when, or where defendant might exercise his right 'to consult with a lawyer.' " (Emphasis omitted.) People v. Walton, 199 Ill. App. 3d 341, 344-45 (1990).

Accordingly, defendant has failed to show that the trial court erred in denying his motion to suppress under Miranda.

## II

Defendant next argues that the trial court erred in failing to suppress his statements to the police, despite the State's failure to notify him of his right to contact the Mexican consulate. The Vienna Convention, drafted in 1963, is intended to "contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems." Vienna Convention on Consular Relations, opened for signature, April 24, 1963, art. 36, 21 U.S.T. 77,

596 U.N.T.S. 261. The United States, upon the advice and consent of the Senate, ratified the Convention in 1969. 21 U.S.T. at 372, 596 U.N.T.S. at ____. Article 36 of the Convention, which addresses consular officers' access to their nationals detained by authorities in a foreign country, provides in part as follows:

"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities

shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." 21 U.S.T. at 100-01, 596 U.N.T.S. 261.

Defendant argues that Article 36 grants him individual, fundamental, judicially enforceable rights and that the violation of these rights should be remedied in a state criminal proceeding by applying an exclusionary rule and suppressing the statements he made to the police.

The United Sates Supreme Court recently addressed an Article 36 claim raised in a state court. Sanchez-Llamas v. Oregon, 548 U.S. ___, 165 L. Ed. 2d 557, 126 S. Ct. 2669 (2006). The Court assumed, without deciding, that Article 36 granted a foreign national individual's enforceable rights. Sanchez-Llamas, 548 U.S. at ___, 165 L. Ed. 2d 574, 126 S. Ct. at 2677-78. However, the Court ultimately denied the claim that the state court was required to apply suppression rule in cases of Article 36 violations:

> "Of course, it is well established that a self-executing treaty binds the States pursuant to the Supremacy Clause, and that the States therefore must recognize the force of the treaty in the course of adjudicating the rights of litigants. See, e.g., Hauenstein v. Lynham, 100 U.S. 483, 25 L. Ed. 628 (1880). And where a treaty provides for a particular judicial remedy, there is no issue of intruding on the constitutional prerogatives of the States or the other federal branches. Courts must apply the remedy as a requirement of federal law. Cf. 18 U.S.C. § 2515; United States v. Giordano, 416 U.S. 505, 524-525, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974). But where a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States through lawmaking of their own."
> Sanchez-Llamas, 548 U.S. at ___, 165 L. Ed. 2d at 576, 126 S. Ct. at 2680.

In this case, defendant acknowledges that this court has repeatedly held that suppression of statements is not an available remedy for violations of Article 36 of the Vienna Convention.

People v. Griffith, 334 Ill. App. 3d 98, 111 (2002); People v. Hernandez, 319 Ill. App. 3d 520, 531 (2001); People v. Villagomez, 313 Ill. App. 3d 799, 809-12 (2000). Defendant argues that we should depart from this precedent, based on article I, section 12, of the Illinois Constitution of 1970, which states:

> "Every person shall find a certain remedy in the laws for all
>
> injuries and wrongs which he receives to his person, privacy,
>
> property or reputation. He shall obtain justice by law, freely,
>
> completely, and promptly." Ill. Const. 1970, art. I, §12.

However, our supreme court has repeatedly held that the remedy and justice provision of the Illinois Constitution of 1970 is merely an expression of a philosophy and not a mandate that a certain remedy be provided in any specific form. Segers v. Industrial Comm'n, 191 Ill. 2d 421 (2000); DeLuna v. St. Elizabeth's Hospital, 147 Ill. 2d 57 (1992); Sullivan v. Midlothian Park District, 51 Ill. 2d 274 (1972). The provision was "not meant to have a substantive effect on Illinois law." Huter v. Ekman, 137 Ill. App. 3d 733, 735 (1985).

Defendant might have argued--though he did not--that he was entitled to greater protections than federal law provides under article I, section 2, the due process clause in our state constitution. Ill. Const. 1970, art. I, §2; see, e.g., People v. McCauley, 163 Ill. 2d 414 (1995) (failing to inform the accused that an attorney retained by the accused's family had arrived and failing to grant access to said counsel violated state due process guarantee, contrary to the holding in Moran v. Burbine, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)). However, we note that McCauley was in many respects a reaffirmation of preexisting Illinois case law, whereas the case law here runs against defendant.

In addition, this court has held that a party seeking relief under the Vienna Convention is required to show actual prejudice in order to be entitled to that relief. Villagomez, 313 Ill. App. 3d at 811. The Villagomez court also approvingly discussed United States v. Alvarado-Torres, 45 F. Supp. 2d 986 (S.D. Cal.1999), in which the court considered just how the terms of the Vienna Convention would be applied when a foreign national was arrested for a criminal offense. The federal court first noted that the Vienna Convention does not require law enforcement officers to allow a foreign national to contact a consular representative before they begin an interrogation. Further, even if the foreign national requests to contact the consulate after being arrested, the Vienna Convention does not require that the officers delay their interrogation until contact is made. The federal court looked at the State Department's interpretation of the Convention. The State Department has indicated that officials comply with the notification requirement by notifying the foreign national of his right to contact the consulate before he is booked for detention. Officers would comply with the Convention by contacting the consulate within 24 hours, or even as late as 72 hours, of the foreign national's request. The State Department has noted that the Vienna Convention does not require that the consulate be notified outside of its regular working hours. Villagomez, 313 Ill. App. 3d at 812, citing Alvarado-Torres, 45 F. Supp. 2d at 991.

In this case, defendant was notified of his Miranda rights in Spanish, and he freely acknowledged that he understood those rights and that he was willing to answer questions in waiver of those rights. The first interrogation occurred at 6 p.m. on February 14, 2000; there is no showing that this was during the consulate's regular working hours. The final interrogation resulted in a written statement taken on February 16, 2000--less than 72 hours later. Given this

record, defendant could not show any prejudice resulting from the State's failure to inform him of any rights defendant might have under the Vienna Convention.

Furthermore, the reasoning of the Supreme Court in Sanchez-Llamas in denying suppression as a remedy often applies with equal force in the state court context. For example:

"Sanchez-Llamas argues that the language of the Convention implicitly requires a judicial remedy because it states that the laws and regulations governing the exercise of Article 36 rights 'must enable full effect to be given to the purposes for which the rights... are intended,' Art. 36(2), 21 U.S.T., at 101 (emphasis added). In his view, although 'full effect' may not automatically require an exclusionary rule, it does require an appropriate judicial remedy of some kind. There is reason to doubt this interpretation. In particular, there is little indication that other parties to the Convention have interpreted Article 36 to require a judicial remedy in the context of criminal prosecutions. See Department of State Answers to Questions Posed by the First Circuit in United States v. Nai Fook Li, No. 97-2034 etc., p. A-9 (Oct. 15, 1999) ('We are unaware of any country party to the [Vienna Convention] that provides remedies for violations of consular notification through its domestic criminal justice system')." (Emphasis in original.) Sanchez-Llamas v. Oregon, 548 U.S. ___, 165 L. Ed. 2d 576-77, 126 S. Ct. at 2680.

Such reasoning tends to run contrary to applying the remedy and justice provision of the Illinois Constitution of 1970 as more than an expression of a philosophy in this case. It also tends to run contrary to the argument that due process requires suppression as a remedy in this context.

Indeed, as the Supreme Court also reasoned, "suppression is not the only means of vindicating Vienna Convention rights. A defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police." Sanchez-Llamas v. Oregon, 548 U.S. ___, 165 L. Ed. 2d at 578-79, 126 S. Ct. at 2682. Thus, foreign nationals are not denied a remedy under the Illinois Constitution of 1970.

The Supreme Court further raised a larger consideration:

"We also agree with the State of Oregon and the United

States that our authority to create a judicial remedy applicable in

state court must lie, if anywhere, in the treaty itself. Under the

Constitution, the President has the power, 'by and with the Advice

and Consent of the Senate, to make Treaties.' Art. II, § 2, cl. 2. The

United States ratified the Convention with the expectation that it

would be interpreted according to its terms. See Restatement

(Third) of Foreign Relations Law of the United States § 325(1)

(1986) ('An international agreement is to be interpreted in good

faith in accordance with the ordinary meaning to be given to its

terms in their context and in the light of its object and purpose'). If

we were to require suppression for Article 36 violations without

some authority in the Convention, we would in effect be

supplementing those terms by enlarging the obligations of the

13

United States under the Convention. This is entirely inconsistent with the judicial function. Cf. The Amiable Isabella, 6 Wheat. 1, 71, 5 L. Ed. 191 (1821) (Story, J.) ('[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty')." Sanchez-Llamas, 548 U.S. ___, 165 L. Ed. 2d at 576, 126 S. Ct. at 2679.

If it is improper for the Supreme Court to enlarge the obligations of the United States under the Convention, it would arguably be worse for this court to do so.

In sum, defendant has not offered any persuasive reason for this court to abandon our prior case law and impose the exclusionary rule in cases of alleged Article 36 violations.

III

Finally, defendant argues that the trial court erred in sentencing him to 20 years in prison, when a codefendant was sentenced to 10 years for the same offense. Sentencing a defendant is a matter of judicial discretion and, therefore, if within statutory limits, a sentence will not be disturbed on appeal unless the trial judge abused his discretion. People v. Perruquet, 68 Ill. 2d 149, 153 (1977). The reason we review the sentence under this standard is because after seeing the evidence and viewing the defendant, the trial judge is "in a better position to determine the punishment to be imposed." Perruquet, 68 Ill. 2d at 154. This court will not substitute its judgment for that of the trial court simply because we would have imposed a different punishment. Perruquet, 68 Ill. 2d at 156.

Generally, similarly situated defendants should not receive grossly disparate sentences; however, a mere disparity of sentences is not in and of itself a violation of fundamental fairness. People v. Caballero, 179 Ill. 2d 205, 216 (1997). While defendants similarly situated should not receive grossly disparate sentences, equal sentences are not required for all participants in the same crime. People v. Godinez, 91 Ill. 2d 47, 55 (1982); People v. Eubanks, 283 Ill. App. 3d 12, 25 (1996). A difference may be justified by the relative character and history of the codefendants, the degree of culpability, rehabilitative potential, or a more serious criminal record. People v. Wolfe, 156 Ill. App. 3d 1023, 1028 (1987). It is not the disparity that controls, but the reason for the disparity. People v. Coustin, 174 Ill. App. 3d 824, 827 (1988).

This court has held that codefendants are not similarly situated where they have not been convicted of the same set of crimes. E.g., People v. Eubanks, 283 Ill. App. 3d 12, 25 (1996). In this case, defendant was sentenced to 20 years for armed robbery, while codefendant Rivera was sentenced to 10 years for armed robbery. However, Rivera was also sentenced to 40 years in prison for murder. Thus, the two defendants were not similarly situated. Accordingly, the trial court did not abuse its discretion is sentencing defendant to 20 years in prison.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

NEVILLE, J., concurs.

PRESIDING JUSTICE QUINN, specially concurring:

I agree that the trial court did not err in denying the defendant's motion to suppress his statements to the police and in sentencing the defendant to 20 years in prison. I also agree that Sanchez-Llamas v. Oregon, 584 U.S. _____, 165 L. Ed. 2d 557, 126 S. Ct. 2669 (2006), is

16

dispositive of the defendant's argument based on Article 36 of the Vienna Convention. I write separately to address a concern raised by justices of our supreme court in their decision in <u>People v. Madej</u>, 193 Ill. 2d 395 (2000).

In that case, the court upheld the defendant's death sentence based on his conviction for first degree murder and rape. The defendant was a Polish national. After arresting the defendant, the police failed to advise the defendant of his rights pursuant to Article 36 of the Vienna Convention. Defendant's death sentence was affirmed on direct appeal (<u>People v. Madej</u>, 106 Ill. 2d 201 (1985)). In 1998, the defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (west 1998)) and a petition for writ of *mandamus*. The Consul General for the Republic of Poland was granted leave to intervene in the *mandamus* proceeding. (<u>People v. Madej</u>, 193 Ill. 2d at 398-400). On appeal from the denial of his section 2-1401 petition and his petition for *mandamus*, defendant argued that the denial of his right to consular notification under Article 36 of the Vienna Convention rendered his conviction and death sentence void. The supreme court held that the defendant's claims were procedurally barred as they were made some 14 years after the expiration of the two-year limitation mandated by section 2-1401. <u>People v. Madej</u>, 193 Ill. 2d at 402.

Justices McMorrow, Harrison and Heiple dissented, Justice Heiple writing:

> "What is cavalierly dismissed here is that the consular notification requirement is meant to ensure that foreign nationals imprisoned abroad have adequate legal representation and that they should be tried in accordance with principles of justice generally recognized in the international community by allowing consular officials to consult with the defendant and with attorneys, court officials and prosecutors. It is important to note that this protection

is designed for Americans abroad as well as for foreign nationals in the United States. In the instant case, however, the Polish Consul General was not even aware of defendant's situation until 1998, some 16 years after his conviction and sentence." People v. Madej, 193 Ill. 2d at 412 (Heiple, J., dissenting, joined by McMorrow and Harrison, JJ.).

Clearly, the judges and lawyers who deal with the issue of consular notification treat it very seriously. Unfortunately, this concern is not shared by everyone.

The Mexican Consulate of Chicago has a listed phone number of 312-855-1380. A person dialing that phone number at any time of the day or night will hear an automated message directing the caller to push a button to receive more information regarding specific topics. These include obtaining vehicle permits, BancoMex, tourism, customs, hours of the consulate, importing household appliances, transportation of corpses or ashes of deceased individuals and visas. Contacting the consulate in connection with a Mexican national being in the custody of a law enforcement agency is not one of the menu choices. No human being answers the phone and the phone number does not provide any method for leaving a message.

This information played no part in my decision to concur in this opinion. As I said in the beginning, Sanchez-Llamas v. Oregon, 548 U.S. ____, 165 L. Ed. 2d 557, 126 S. Ct. 2669 (2006), is dispositive of the issue of the effect of a violation of Article 36 of the Vienna Convention. I provide this information for the benefit of those people who will read this opinion and conclude that this court is improperly sanctioning the actions of law enforcement officers who are trampling on the rights of foreign nationals. I also provide this information for the benefit of all foreign consulates in Illinois.

The defendant argues that the consulate notification requirement of Article 36 of the Vienna Convention is meaningless without the "hammer" of the exclusionary rule to back it up. As discussed by the majority, the Supreme Court has rejected this argument. Sanchez-Llamas v. Oregon, 548 U.S. at ____, 165 L. Ed. 2d at 579, 126 S. Ct. at 2680. I believe that it is patently obvious that the consular notification requirement is indeed meaningless when the consulate does not provide a means to be contacted.

While the Mexican consulate's failure to provide a means for anyone to contact them has not played a part in the decision of this case, it may properly be considered when made part of the record in future cases. It would appear to be relevant to the issue of whether a defendant can establish that he was prejudiced by the failure to advise him of his right to contact his national consulate. See People v. Villagomez, 313 Ill. App. 3d 799, 811 (2000).