No. 1-96-3750

SECOND DIVISION

JUNE 16, 1998

THE PEOPLE OF THE STATE OF ILLINOIS, ) APPEAL FROM

) THE CIRCUIT COURT

Plaintiff-Appellee, ) COOK COUNTY.

)

v. ) No. 93 CR 1352

                              )            

ALLEN DUNCAN, ) THE HONORABLE

) JAMES D. EGAN,

Defendant-Appellant.    ) JUDGE PRESIDING. 

JUSTICE COUSINS delivered the opinion of the court: 

Defendant Allen Duncan and codefendants Jermail Lake, Lemont Lake and Tineshea Lake were charged by indictment with two counts of first degree murder in the shooting death of Alvin Gilmore.  After a bench trial, defendant was found guilty of first degree murder and sentenced to 21 years' imprisonment.

On appeal, defendant Allen Duncan contends that: (1) his conviction should be reversed because there was no written jury waiver and because the trial court failed to ensure that he understood the difference between a bench trial and a jury trial, failed to inform him that he had a constitutional right to be tried by a jury of his peers and failed to ensure that the waiver of his right to a jury was knowing and voluntary; and (2) the State failed to prove him guilty of first degree murder under a theory of accountability.  

BACKGROUND 

Events that began with a street encounter between two women and a slap ended on December 26, 1992, with a hail of bullets being fired at and into a building.  As a result, Alvin Gilmore, who was inside the building, suffered a fatal gunshot wound to the head.  

On December 26, 1992, Lashundia Davis, while on her way to a store by her home, ran into Tineshea Lake, who was with two other women, Rashawn Jackson and Kimberly Manning.  Tineshea had previously dated Lashundia's boyfriend, Orlando Potts.  Rashawn approached Lashundia, said something to her and slapped her across the face.  At this point, Tineshea said "let's get her."  Lashundia then ran home and spoke to her sister and brother, who then accompanied her to Tineshea's home.  At Tineshea's house, Lashundia offered to fight Tineshea but Tineshea refused and Lashundia went home.  On her way home, Lashundia ran into her mother and her boyfriend, Orlando Potts.  After they conversed, Orlando Potts went to Tineshea's house and broke windows in her house.  

Ben Harden testified for the State pursuant to a plea agreement in which first degree murder charges against him were dropped and he received a sentence of 12 years' imprisonment for aggravated discharge of a firearm.  According to Harden's testimony, he was in a car with Lemont Lake when Lemont stopped to make a phone call in response to a page he received on his pager.  Harden testified that Lemont appeared to be angry when he got back in the car and told Harden that "[t]hey was bogus."  Lemont then drove to defendant's apartment on 55th and Union Streets.  Once inside, Lemont told defendant to "give me that," at which point defendant retrieved a black, 9 millimeter gun along with a loaded clip and handed it to Lemont.  Lemont put the loaded clip into the gun.  

Lemont Lake, Ben Harden and defendant left defendant's apartment where, soon thereafter, they saw Jermail Lake and Shon Scott.  Lemont told Jermail and Shon, "They was bogus for doing that."  Defendant, Lemont Lake and Ben Harden then drove to the Lake house at 39th and Prairie, where they met Jermail Lake and Shon Scott, who had driven separately.  Rashawn Jackson was sweeping up the glass from the window that Orlando Potts had broken.  Harden further testified that Tineshea told Lemont that Orlando had broken the windows because she had called him "out [
sic
] his name."  Harden also testified that Tineshea told the group, which consisted of himself, defendant, Lemont Lake, Jermail Lake and Shon Scott, that they should go to Orlando's house and "kick his ass," but that they should be careful because someone would be there.  Lemont then pulled out the 9 millimeter gun and said, "don't worry about it."  

Defendant, Lemont Lake, Ben Harden, Shon Scott and Jermail Lake left the apartment and walked northbound on Prairie to Lashundia's house.  Lashundia lived at 3932 S. Prairie, which is a low-rise housing unit.  When they reached a tree about 30 feet away from Orlando's apartment, Lemont told the group to stop, pulled the gun out of his jacket and aimed it toward the apartment.   As Lemont fired the gun he said, "watch me light this place up."  He fired 16 shots at the apartment.  On cross-examination, Harden testified that he could see people in Orlando's apartment before Lemont began shooting.

Defendant, Ben Harden, and Lemont Lake ran to Lemont's car and defendant drove them to Lemont's house, where they drank and watched videos.  Jermail Lake and Shon Scott arrived 5 to 10 minutes later.  Jermail then made a phone call in which Ben heard him say, "Is everybody straight?  Is she O.K.?"  Approximately 15 minutes later, the police arrived and arrested everyone.

At trial, Lashundia Davis testified that, at about 6:30 p.m., shortly after Orlando had gone to Tineshea's home to break her windows, she was at home with her mother, siblings, Eric Watkins and her nieces and nephews, including Alvin Gilmore.  Eric Watkins looked out the window and said something that caused Lashundia to look out the window.  When Lashundia looked out the window she saw defendant, Rashawn Jackson, Kimberly Manning, Tineshea, Lemont Lake and Jermail Lake approaching her apartment from the courtyard directly across from her apartment.  Lashundia claimed that the group was within 40 feet of her apartment at one time prior to shooting.  Prior to the shooting, 14 year-old Alvin Gilmore was sitting at the kitchen table near a window.  Testimony established that he died from a gunshot wound to his brain.  

At the conclusion of simultaneous bench and jury trials,  all of the defendants were found guilty of first degree murder.  Defendant was sentenced to 21 years' imprisonment and now appeals.

We affirm.

ANALYSIS

I

Defendant first contends that he is entitled to a new trial because he did not waive his right to a jury trial in writing as is required by section 115--1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115--1 (West 1992)), nor did he understandingly and knowingly waive his right to a jury trial in open court.  

Section 115--1 of the Code states that "[a]ll prosecutions *** shall be tried by the court and a jury unless the defendant waives a jury trial in writing." 725 ILCS 5/115--1 (West 1992).  However, in 
People v. Tooles
, 177 Ill. 2d 462, 464, 687 N.E.2d 48, 49 (1997), the Illinois Supreme Court recently reiterated the well-settled rule that the failure to secure a written jury waiver does not require a new trial where it can be shown that the defendant's waiver was otherwise understandingly made.  
Tooles
, 177 Ill. 2d at 464, 687 N.E.2d at 49; 725 ILCS 5/103-6 (West 1992)
.  Rather, the determination of whether a jury waiver was made understandingly turns on the facts and circumstances of each particular case.  
Tooles
, 177 Ill. 2d at 469, 687 N.E. 2d at 51, citing 
People v. Tye
, 141 Ill. 2d 1, 24, 565 N.E.2d 931 (1990).  

Defendant argues that 
Tooles
 
requires that the trial court question the defendant in order to ensure that his jury waiver is understandingly made.  In 
Tooles
, the supreme court reviewed the trial records of three defendants, Tyreese Tooles, William Farmer and Demarco Gray, in order to ascertain whether each defendant had understandingly waived his right to a jury trial.  In each trial, the respective trial courts spoke directly to the defendants.  Defendants Tooles and Gray were asked whether they understood the difference between a bench and jury trial. 
Tooles
, 177 Ill. 2d at 469, 472, 687 N.E.2d at 52, 53.  Tooles was asked whether his desire to waive his right to a jury trial was the product of any promises or threats.  
Tooles
, 177 Ill. 2d at 469, 687 N.E.2d at 52.   Furthermore, both Tooles and Farmer were told that their right to a jury trial was a constitutional right.  
Tooles
, 177 Ill. 2d at 469, 687 N.E.2d at 52.  It was explained to defendants Farmer and Gray that waiving their right to a jury trial would result in a judge, without a jury, deciding the case.  
Tooles
, 177 Ill. 2d at 469-472, 687 N.E.2d at 52-53.   In light of these facts, the supreme court concluded that all the defendants had understandingly waived their right to a jury trial.   

In the case 
sub
 
judice
, defendant argues that, under 
Tooles
, a trial court is now required to follow the factors mentioned in 
Tooles
, 
i.e.
, inform the defendant that his right to a jury trial is a constitutional right, explain the difference between a bench and jury trial and question whether the defendant's desire to waive his right to a jury trial is the product of any promises or threats in order to ensure that a defendant's jury waiver is understandingly made.   We believe defendant misinterprets 
Tooles
.  In our view, 
Tooles
 does not require specific admonishments or advice to a defendant.  To the contrary, citing 
People v. Smith
, 106 Ill. 2d 327, 478 N.E.2d 357 (1985), the 
Tooles
 court specifically stated:

"[W]e review each defendant's trial record to determine whether he understandingly waived his right to a jury. In doing so we observe that, while the circuit court must insure that a defendant's jury waiver is understandingly made, 
no set admonition or advice is required before an effective waiver of that right may be made
.  
Smith
, 106 Ill. 2d at 334. The determination whether a jury waiver was made understandingly instead turns on the facts and circumstances of each particular case.  
People v. Tye
, 141 Ill. 2d 1, 24 (1990)." (Emphasis added.) 
Tooles
, 177 Ill. 2d at 469, 687 N.E. 2d at 51.

People v. Smith
, 106 Ill. 2d  327, 478 N.E.2d 357 (1985), in turn, cites 
People v. Frey
, 103 Ill. 2d 327, 469 N.E.2d 195 (1984), for the proposition that no set admonition or advice is required before an effective jury waiver may be made.  
Smith
, 106 Ill. 2d at 334.

In 
People v. Frey
, 103 Ill. 2d 327, 469 N.E.2d 195, the record on appeal included only the record of the bench trial and did not include a record of the discussions between the court and defense counsel prior to trial. 
Frey
, 103 Ill. 2d at 330.  The appellate court ordered a new trial because it did not believe the record supported a finding that the defendant had implicitly or explicitly waived a jury trial.  
Frey
, 103 Ill. 2d at 331-32.  The Illinois Supreme Court disagreed and concluded that the defendant's jury waiver was valid because the defendant was present on occasions when the matter of a bench trial was discussed.  
Frey
, 103 Ill. 2d at 333.  The supreme court concluded that the orders that had been filed prior to trial that were included in the record indicated that a bench trial had been set and therefore reflected defense counsel's willingness to try the case before the court.  
Frey
, 103 Ill. 2d at 332-33.  The supreme court further noted that, on the day of trial, a colloquy took place between the court and defendant in which the only reference made to a bench trial was the trial court's comments on the matter.  The trial court stated: "[t]hese causes were set today for purposes of bench trial and the issues presented by all three counts pending against this defendant.  Are the People ready for trial at this time?" (Emphasis omitted.) 
Frey
, 103 Ill. 2d at 331.  The supreme court pointed out that, typically, an accused speaks and acts through his attorney and, therefore, effect is given to jury waivers made by defense counsel in defendant's presence where the defendant gives no indication of any objection to the court.  
Frey
, 103 Ill. 2d at 332.  In this way, the supreme court concluded, the accused will not be permitted "to gamble on the outcome before the judge without a jury and then if dissatisfied make a belated demand for a jury."  
Frey
, 103 Ill. 2d at 333.

Thus, 
Tooles
 holds that, in the absence of a written jury waiver or specific admonishment or advice by the trial court, a defendant has nevertheless knowingly, understandingly and voluntarily waived his constitutional right to a jury trial in open court when he permits his counsel in his presence and without his objection to waive his right to a jury trial on his behalf.  

In the instant case, the following colloquy occurred:

"THE COURT: Mr. Scott [defendant].  You understand that Mr. Levin is going to be representing Lamonte [
sic
] at a jury trial, yourself at a bench trial.  Is that what you wish to have?

MR. SCOTT: Yes, sir.

THE COURT: [To defense counsel Mr. Levin] Who is your other client?

MR. LEVIN [defense counsel]: Allen Duncan.

THE COURT: Mr. Duncan.

DEFENDANT: Yes I do, judge.

THE COURT: You understand Mr. Levin is going to be representing Lamonte [
sic
] Lake on a jury trial and he's elected, been elected, you will be proceeding to a bench trial and he will be representing both of you.  You understand that?

DEFENDANT: Yes.

THE COURT: That's your wish?

DEFENDANT: Yes.

THE COURT: All right."

Here, defendant was specifically asked whether he wanted a bench trial and whether he understood that Mr. Levin would be representing him at the bench trial.  Defendant responded directly to the trial court's inquiries.  Thus, the record shows that defendant understandingly waived his right to a jury.  

In 
People v. Asselborn
, 278 Ill. App. 3d 960 (1996), the following colloquy occurred:

"THE COURT: Have a seat.  Jury waiver.  Bench or jury?

MR. LEVIN [Defense counsel]: It will be a bench your Honor."  
Asselborn
, 278 Ill. App. 3d at 962.  

We concluded that the defendant in that case properly waived his right to a jury trial in open court because he was present during the colloquy and failed to object to his counsel's actions.  
Asselborn
, 278 Ill. App. 3d at 962-63.  

Notably, in 
Asselborn
, the court spoke to the attorney in defendant's presence.  Here, the court not only spoke to the attorney, the court spoke to the defendant and the defendant said yes and indicated that he understood that he was electing to proceed with a bench rather than jury trial.  Thus, the record establishing waiver in the instant case is even stronger than the record in 
Asselborn
.

Defendant relies on 
People v. Scott
, 293 Ill. App. 3d 241, 687 N.E.2d 1154 (1997), in which the Fifth District Appellate Court reversed the defendant's conviction because his written jury waiver had been filed outside open court.  Furthermore, the defendant was not present when a jury waiver was finally mentioned and waived in open court.  
Scott
, 293 Ill. App. 3d at 244.  However, 
Scott
 is distinguishable from the instant case.  Here, defendant was present in open court and responded directly to the trial court's inquiries.  Accordingly, under 
Tooles
, we cannot conclude that defendant failed to properly waive his right to a jury trial.

II

Finally, defendant argues that there was insufficient evidence to convict him of first degree murder under a theory of accountability.   Specifically, he argues that the State failed to prove beyond a reasonable doubt that he was part of a common criminal design or common plan to commit a battery or to participate in the shooting that resulted in the death of Alvin Gilmore.  We disagree.

Section 5--2(c) of the Criminal Code incorporates the common design rule, which provides that where two or more people engage in a common criminal design or agreement, any acts committed in furtherance of the plan by any one party are considered to be the acts of all the parties and all are accountable for those acts.  720 ILCS 5/5--2(c) (West 1992); 
People v. Shelton
, 293 Ill. App. 3d 747, 754, 688 N.E.2d 831  (1997); 
People v. Eubanks
, 283 Ill. App. 3d 12, 20-21, 669 N.E.2d 678 (1996).  Moreover, a defendant may be charged with murder based on a theory of accountability where the defendant enters a common design to commit only a battery, yet a murder is committed during the course of the battery.  
People v. McClain
, 269 Ill. App. 3d 500, 505, 645 N.E.2d 585 (1995).

Here, defendant was accountable for the actions of Lemont.  The evidence presented indicates that defendant gave Lemont the nine millimeter gun that was used in the shooting.  The group met at the Lake home where Tineshea told the group, which included defendant, that they should "kick [Orlando's] ass."  At that point, Lemont displayed a gun and told Tineshea not to worry about it.  Thus, defendant was a party to a common criminal design.  See 
Eubanks
, 283 Ill. App. 3d at 21.  Defendant then left with the group and went directly to Lashundia's house with the intent to hurt Orlando Potts.   After the shooting, defendant drove part of the group back to Lemont Lake's house.  The fact that Lemont shot Alvin Gilmore during the execution of the group's common plan to hurt Orlando Potts is sufficient to hold defendant accountable for the shooting.  In light of these circumstances, defendant was accountable for the murder of Alvin Gilmore.

For the reasons cited herein, the judgments of the circuit court of Cook County are affirmed.  As part of our judgment, we grant the State's request and assess defendant $150 as costs for this appeal.

Affirmed. 

McNULTY, P.J., and TULLY, J., concur.