In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3407

SOLOMON MONROE,

*Petitioner-Appellant*,

*v.*

RANDY J. DAVIS, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 4334—**Joan B. Gottschall**, *Judge*.

ARGUED APRIL 10, 2012—DECIDED APRIL 4, 2013

Before POSNER, ROVNER and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Solomon Monroe appeals the district court's decision to deny his petition for a writ of habeas corpus. *Monroe v. Zimmerman*, 2010 WL 3307081 (N.D. Ill. Aug. 18, 2010); *see* 28 U.S.C. § 2254. Monroe was convicted of first-degree murder on an accountability theory in the Circuit Court of Cook County, Illinois, and sentenced to a term of 40 years. Monroe contends that his federal constitutional rights were violated in three

respects: he was arrested without probable cause, in violation of the Fourth Amendment; his trial counsel was ineffective in failing to call his brother and sister-in-law as witnesses at trial and in support of his motion to suppress his post-arrest statements, in violation of his Sixth Amendment right to effective legal representation; and finally that the State presented insufficient evidence to support his conviction on an accountability theory, in violation of his Fourteenth Amendment right to due process. Finding no merit in any of these arguments, we affirm the denial of his habeas petition.

## I.

In the early morning hours of November 23, 1996, Keith Stalker was fatally bludgeoned and stabbed in the aftermath of a drug sale gone wrong. Witnesses to the attack on Stalker led Chicago police to Monroe and three fellow members of the Black P-Stone Nation street gang: Michael Thomas, Tyrone Curry, and Tory Jackson. It turned out that these four men had been making street sales of crack cocaine and Stalker, a member of another gang, had been helping to recruit customers for them. Stalker incurred the wrath of the other men after two members of Stalker's gang drove up to make a purchase but then sped off without paying for the cocaine they had been given. He was beaten by Monroe and Curry, and then stabbed by Thomas. Monroe would later acknowledge that he did strike Stalker but denied any foreknowledge that Thomas would stab him. Monroe pleaded not guilty to a charge of murder

and proceeded to trial, contending that he harbored no knowledge or intent that Stalker would be killed.

Jackson, after himself being acquitted on a murder charge, opted to cooperate with the authorities and was a key witness against Monroe at trial. Jackson explained that on the evening of November 22-23, 1996, he, Thomas, Curry, and Monroe were selling crack cocaine on the 4500 block of North Magnolia Avenue, in the heart of Chicago's Uptown neighborhood. Each of the men played a different role in the operation of their "drug spot": Thomas, a ranking member of the gang, was responsible for supplying the cocaine and supervising and enforcing discipline among the others. Jackson took care of the retail end of the operation, locating customers and making hand-to-hand sales. Monroe kept the stash of cocaine hidden and supplied retail-quantity packets of cocaine to Jackson as needed. Curry handled security, keeping one eye on the cocaine supply and another on Jackson, to make sure that he was not "stuck up" by a customer. R. 31-3 at 11. Stalker, who was a member of the Gaylord Nation street gang, helped Jackson recruit customers. Stalker was a cocaine addict and a frequent customer of Jackson's, and on occasion he helped out Jackson in exchange for cocaine when he lacked the money to support his habit. Their role in fielding customers required Jackson and Stalker to station themselves on the street, while the others largely kept themselves out of view in nearby gangways and shrubbery.

Jackson recalled that sometime between 3:00 and 4:00 a.m. on November 23, a red Chevy Blazer drove up.

A passenger exited the vehicle and spoke briefly with Stalker. The man had the letters "GLN" tattooed across his forehead. GLN is an abbreviation for Gaylord Nation, the gang to which Stalker belonged; and Stalker appeared to know the man. He was interested in making a drug purchase, so Stalker steered him to Jackson. The man asked Jackson what $150 would buy him; the answer was an "eight ball" (about 3.5 grams) of crack cocaine. Jackson did not have that quantity on his person, so he directed the Blazer to drive around the block while he obtained the cocaine from Monroe. When the vehicle returned, Jackson handed the cocaine to the passenger through the open car window. Immediately after Jackson handed the cocaine over, the Blazer sped away. Jackson, who had not been paid, grabbed the door frame and managed to hold onto the speeding vehicle for a couple of blocks, until the driver deliberately brushed the Blazer against an El viaduct, knocking Jackson to the ground unconscious. Another customer of Jackson's, who happened to witness the incident, roused him back to consciousness, and Jackson made his way back to the drug spot.

Jackson found Thomas in a gangway. Thomas was furious about the loss of the cocaine, and he knocked Jackson to the ground with a punch to the eye. As Jackson picked himself up, he saw that Thomas was angrily stabbing the ground with a 12-inch long "Rambo" hunting knife. Thomas grumbled that Jackson was "always fucking up." R. 31-3 at 30. As the two men were talking, they heard Curry whistle twice, which they recognized as a signal for the gang members to show

themselves. Jackson and Thomas walked out of the gang-way onto Magnolia Avenue, where they saw that Curry and Monroe were down the block, escorting Stalker, shoulder to shoulder, toward them. According to Jackson, as he and Thomas emerged from the gang-way, Monroe struck Stalker in the face, causing him to fall to the ground. Monroe, joined by Curry, continued to punch Stalker. Then Monroe ran over to a nearby construction dumpster and retrieved a two-by-four piece of wood, which he used to strike Stalker twice. Curry then took the board from Monroe and began to strike Stalker with it himself. Jackson estimated that the two men hit Stalker with the board a total of five to seven times.

At this point, Thomas left Jackson and ran over to the other men. As Thomas approached, Monroe backed away from Stalker by about a foot. Without any fore-warning, Thomas produced his knife and stabbed Stalker in the stomach. After Thomas removed the knife from Stalker's abdomen, he along with Jackson, Curry, and Monroe fled the scene in Monroe's car. They drove to an apartment belonging to friends of Thomas's on the south side of the city, where they spent the night.

Stalker was taken to Illinois Masonic Hospital, where he died later that day. An autopsy would reveal lacerations to the upper back portion of Stalker's head and to his shin and lower leg, abrasions on the front and side of his head, and contusions on his cheeks and lips—all consistent with being struck by a blunt object (including a fist and a two-by-four)—as well as a nine-

inch, jagged wound to his upper abdomen. The assistant medical examiner found evidence of swelling of the brain resulting from the blows to Stalker's head. The examiner concluded that Stalker died as a result of the stab wound to his abdomen, and that the trauma inflicted on Stalker's head was a significant contributing factor to his death.

Preliminary investigation led the police to Jackson, who told them what had happened and gave them Monroe's address. The police took custody of Monroe at his home and took him to a police station for questioning. There, Monroe orally acknowledged, first to a detective and later to a prosecutor, that he had participated in the beating of Stalker and had struck him twice with the two-by-four. In a final, corrected written statement, Monroe indicated that he and Curry had completed their attack on Stalker before Thomas approached with the knife; earlier, he had indicated that the beating was still in progress when Thomas ran up and stabbed Stalker.

Monroe was charged with murder on an accountability theory. Before trial, Monroe moved to quash his arrest (along with the fruits of the arrest, including his post-arrest statements), contending that the police lacked probable cause to believe he was involved in Stalker's murder as of the time they took him into custody at his home. Separately, Monroe moved to suppress the oral and written statements he made at the police station on the ground that they were the product of coercion, alleging that he was improperly isolated,

denied access to an attorney, and physically abused by the detectives who questioned him. The trial judge denied both motions after a hearing. In denying the motion to quash the arrest, the trial court rejected Monroe's contention that he was arrested at his home. The court instead found that Monroe had accompanied the police voluntarily to the police station and was placed under arrest there at a later time, by which point the police had ample evidence confirming his involvement with Stalker's death.

Monroe testified in his own defense at trial. Monroe again acknowledged that he struck Stalker with the two-by-four. Monroe testified that he did so after Stalker first picked up the two-by-four and swung at him (Monroe) without provocation, striking him in the hand as he was attempting to shield his head from the blow. At that point, Curry punched Stalker, knocking him to the ground. Monroe, angry with Stalker over the unprovoked assault, picked up the board and struck Stalker, but only twice and in the legs. Then Curry snatched the two-by-four away from Monroe, and Monroe began to walk away. He saw and heard Curry inflict one or two blows on Stalker with the board. Curry then caught up with Monroe as he continued to walk away from the scene. It was at that point, Monroe testified, that Thomas ran past Monroe and Curry to Stalker, pulled out the knife, and stabbed Stalker. Monroe said that he and Curry were half a block away from Stalker when Thomas stabbed him. Thomas then joined Monroe and Curry, and they left the scene along with Jackson and drove to the south side, where they spent the night.

Monroe denied that he harbored any knowledge or intent that Stalker would be stabbed. There was no agreed-upon plan to kill or harm Stalker, Monroe testified, and Thomas had never said he was going to stab Stalker; Monroe said he did not even know that Thomas had a knife.

Monroe's testimony departed from his written statement in certain respects, including his assertion at trial that Stalker had taken the first swing with the two-by-four and that Monroe and Curry were half a block away from Stalker when Thomas stabbed him. Monroe testified that his written statement was not accurate and that he had signed the statement under duress. As he had in moving to suppress his oral and written statements, Monroe testified that he was punched repeatedly by two of the detectives who questioned him; that his request for counsel was disregarded; and that he was threatened with life imprisonment if he did not sign the written statement. The State's witnesses denied that any such abuse or coercion had occurred.

As we noted at the outset, the jury convicted Monroe on the murder charge. The Illinois Appellate Court affirmed his conviction in an unpublished order, holding, inter alia, that there was probable cause to arrest Monroe and that the evidence presented at his trial was sufficient to sustain his conviction. The Illinois Supreme Court denied Monroe's petition for leave to appeal. In 2002, Monroe filed a postconviction petition in state court, contending that his trial counsel was ineffective in failing to call as witnesses in support of his motion to

suppress and at trial his brother and sister-in-law, Chris and Isabell Estavia, who lived in the same two-flat as Monroe and his mother and were witnesses to his arrest. Monroe represented that the Estavias would have testified that the police forced their way into the residence, threatened the family dog, and ignored Monroe's requests to telephone his lawyer; that testimony, Monroe asserted, would have supported his motion to suppress his post-arrest statements and also would have bolstered his trial testimony about the duress to which he was subjected at the police station. The trial court summarily dismissed the petition as lacking merit. The appellate court affirmed the dismissal in an unpublished order, reasoning in view of certain conflicts between the Estavias' prospective testimony and certain other evidence and arguments presented by the defense that Monroe's counsel had legitimate strategic reasons not to call the Estavias as witnesses and that Monroe had not shown that he was prejudiced by counsel's failure to present their testimony. Monroe again sought leave to appeal to the Illinois Supreme Court, but the court denied his petition.

Having exhausted his state-court remedies, Monroe filed a pro se petition for a writ of habeas corpus in the district court. Included in that petition were the three claims Monroe pursues in this appeal: that he was improperly arrested without probable cause in violation of the Fourth Amendment, such that the statements he made following his arrest should have been suppressed; that the State's evidence was insufficient to sustain his conviction for murder on an accountability theory; and that his trial counsel was ineffective for

failing to present the testimony of his brother and sister-in-law as to the police misconduct surrounding his arrest. (A fourth claim was dismissed on the ground of procedural default and is not at issue in this appeal.) R. 1.

The district court denied Monroe's petition. *Monroe v. Zimmerman, supra*, 2010 WL 3307081. Because the state court had given Monroe a full and fair opportunity to present his motion to quash his arrest, the district court reasoned, *Stone v. Powell* 428 U.S. 465, 494, 96 S. Ct. 3037, 3052 (1976), precluded it from considering the merits of his Fourth Amendment claim. *Monroe*, 2010 WL 3307081, at *8. As to the sufficiency of the evidence, the court noted that under Illinois law, as summarized by the Illinois Appellate Court in affirming Monroe's conviction, a defendant may be convicted of murder on an accountability theory when he enters into a common plan to commit a battery and a murder is then committed in the course of the battery. *Id.,* at *9. The court noted that there was ample evidence supporting an inference that Monroe had entered into a joint plan with his fellow gang members to commit a battery on Stalker in retaliation for the theft of the drugs by members of Stalker's gang. In view of that evidence, the Illinois Appellate Court's rejection of Monroe's sufficiency argument was not objectively unreasonable. *Id.* Finally, as to Monroe's claim of attorney ineffectiveness, the court found no reason to question the reasonableness of the Illinois Appellate Court's conclusion that trial counsel had legitimate reasons not to call the Estavias as witnesses at either the suppression hearing or the trial, in view of the conflicts between their prospective testimony and the other evidence and argu-

ments that Monroe's counsel presented at the suppression hearing, the fact that their credibility in view of those conflicts and their status as Monroe's family members was diminished, and Monroe's omission to raise the circumstances of his arrest at trial. The court also discerned nothing unreasonable in the state court's conclusion that Monroe had not demonstrated that he was prejudiced by his counsel's decision not to present the Estavias' testimony. *Id.*, at *10-*12.[1] The district court subsequently granted Monroe's request for a certificate of appealability in part, finding as to these three issues that Monroe had made a substantial showing that he was denied his constitutional rights, in that these issues are "debatable among jurists of reason," and Monroe's arguments "deserve encouragement to proceed further." *Monroe v. Zimmerman*, 2010 WL 4038787, at *1 (N.D. Ill. Oct. 12, 2010) (quoting *Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997)); R. 40; *see* 28 U.S.C. § 2253(c).

## II.

### A. Denial of motion to quash arrest

Monroe challenges the denial of his motion to quash his arrest. He contends that because the police lacked

---

[1] Because Monroe had not shown that his trial counsel was ineffective, the court rejected Monroe's additional argument that his appellate counsel was ineffective for not raising this claim in Monroe's direct appeal of his conviction. 2010 WL 3307081, at *13.

probable cause to believe he had committed a crime as of the time he was arrested at his home, he was seized in violation of the Fourth Amendment, and consequently the statements he subsequently made while in custody should have been barred from evidence pursuant to the exclusionary rule.

We begin by taking note of a threshold argument that the State has raised in response to Monroe's appeal on this point, which is that although Monroe has contended that he did not receive a full and fair hearing on his motion to quash in state court, he has not separately renewed his contention that the police lacked probable cause to arrest him as of the time he was taken into custody at his home. The State reads Monroe's brief to presume that the denial of a full and fair hearing on his motion by itself would entitle him to habeas relief. Such a presumption would be incorrect, as the State maintains. As we shall discuss in greater detail in a moment, and as the district court recognized, *Stone v. Powell*, supra, 428 U.S. at 494, 96 S. Ct. at 3052, bars a federal habeas court from reaching the merits of a petitioner's Fourth Amendment claim so long as the state court granted him a full and fair hearing on the claim. Establishing that the petitioner was not granted a full and fair hearing is thus the means of surmounting the *Stone* bar and opening the door to federal review of the merits of the petitioner's Fourth Amendment claim. *See Wallace v. Kato*, 549 U.S. 384, 395 n.5, 127 S. Ct. 1091, 1099 n.5 (2007) (collecting habeas decisions in which courts proceeded to merits of Fourth Amendment claims after finding that petitioners were denied full

and fair hearings on these claims in state court). Relief on a Fourth Amendment claim thus requires a habeas petitioner to show two things: (1) that the state court denied him a full and fair hearing on his claim, and (2) that the claim was meritorious. Monroe's brief never reaches step 2. We do not read the omission by itself as reflecting a presumption that it is unnecessary for Monroe to show that his Fourth Amendment rights were violated. His brief instead repeatedly contends that because he was denied a full and fair hearing on his claim in state court, he is entitled to habeas "review" (*e.g.*, Monroe Br. 16, 18, 25, 29, 38), which is probably best understood as a request, in the event we agree he was denied a full and fair hearing, that we order the district court to take up the merits of this claim.

More troubling is the statement in Monroe's brief that "Monroe's appointed counsel does not argue on this record that his arrest can be said to have lacked probable cause." Monroe Br. 39. That reads like a concession that the police had probable cause to arrest him, regardless of when the arrest occurred. If Monroe has no argument that he was arrested without probable cause, even if, as he contends, he was arrested at his home, then it is not clear what is at stake in this appeal. *Cf. New York v. Harris*, 495 U.S. 14, 21, 110 S. Ct. 1640, 1644-45 (1990) (exclusionary rule does not bar admission of post-arrest statement that defendant makes outside of home following police officers' warrantless and non-consensual entry into his home to make arrest, in violation of *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980), so long as arrest was supported by probable cause). In

any event, because we conclude below that the state court did not deprive Monroe of a full and fair hearing on his Fourth Amendment claim, we need not consider whether the failure to contest the existence of probable cause might constitute a forfeiture, if not a waiver, of the Fourth Amendment claim.

Ultimately, in order to prevail on his Fourth Amendment claim, Monroe would have to show not only that he was arrested without probable cause, but that the state court, as a result of the improper arrest, should have invoked the exclusionary rule to bar the admission of his post-arrest statements at trial. *See Hampton v. Wyant*, 296 F.3d 560, 562 (7th Cir. 2002). But as the Supreme Court emphasized in *Stone*, 428 U.S. at 486, 96 S. Ct. at 3048, the primary aim of the exclusionary rule is to deter the police from violating the Fourth Amendment rather than to remedy an injury to the individual. "Evidence obtained by police officers in violation of the Fourth Amendment is excluded at trial in the hope that the frequency of future violations will decrease." *Id.* at 492; 96 S. Ct. at 3051. Application of the rule comes at a price, for excluding probative evidence of a defendant's wrongdoing "deflects the truthfinding process and often frees the guilty." *Id.* at 490, 96 S. Ct. at 3050. The Court was convinced that the benefits of the exclusionary rule outweigh the costs when invoked at trial or on direct appeal of a defendant's conviction. *Id.* at 492-93, 96 S. Ct. at 3051-52. But the Court perceived whatever additional benefit there might be to invoking the rule on collateral review of a defendant's conviction to be too slight to justify its cost.

The view that the deterrence of Fourth Amendment violations would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal. Even if one rationally could assume that some additional incremental deterrent effect would be presented in isolated cases, the resulting advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice.

*Id.* at 493-94; 96 S. Ct. at 3052 (footnote omitted). This led the Court to conclude that relief on a Fourth Amendment claim should normally be unavailable to a petitioner in habeas corpus: "[W]e conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S. Ct. at 3052 (footnotes omitted).

Much ink has been spilled over what exactly constitutes a full and fair hearing for purposes of *Stone*. *See Cabrera v. Hinsley*, 324 F.3d 527, 530-31 (7th Cir. 2003). Our decisions in *Cabrera* and *Hampton* make clear that it means more than just the opportunity to present one's Fourth Amendment claim to the state court. *Id.* at 531-32; *Hampton*, 296 F.3d at 563-64. A state court process that amounts to a sham would not constitute a full and fair hearing even though the petitioner had his day in

court on the claim. *Cabrera*, 324 F.3d at 531-32; *Hampton*, 296 F.3d at 563-64. Evaluating the adequacy of the hearing thus requires us to give at least "*some* attention to how the state court dealt with the merits" of the claim. *Id.* at 564 (emphasis in original). But not *too* much attention, as we added in *Cabrera*. 324 F.3d at 531. Our role is not to second-guess the state court on the merits of the petitioner's claim, but rather to assure ourselves that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision. *See Hampton*, 296 F.3d at 563-64; *see also Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005).

Here, Monroe contends that a threshold error made by the trial judge in resolving his motion to quash his arrest reveals that the hearing he received was neither full nor fair. It takes more than an error in the state court's analysis to surmount the *Stone* bar to collateral relief, however. *Id.* at 998; *Cabrera*, 324 F.3d at 532; *Hampton*, 296 F.3d at 564; *see also Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007).

> An "egregious error" in a state court's Fourth Amendment decision may suffice for this purpose, *Turentine* [*v. Miller*], 80 F.3d [222] at 226 [(7th Cir. 1996)], but not for the flaw it exposes in the state court's analysis but rather for what it reveals about the bona fides of the state court's handling of the Fourth Amendment claim, *Hampton*, 296 F.3d at 564. As we explained in *Hampton*, "a blunder, no matter how obvious, matters only in conjunction with other circumstances that imply refusal by the state

judiciary to take seriously its obligation to adjudicate claims under the Fourth Amendment." *Id.* . . . .

*Miranda*, 394 F.3d at 998. As we shall see, the state court's error in this case does not betray an unwillingness on the part of the Illinois judiciary to treat Monroe's claim honestly and fairly.

The State more or less concedes that the trial court indeed did err on a material point. The thrust of Monroe's motion to quash was that he was arrested at his home without probable cause. In denying the motion, the trial court found that Monroe had instead voluntarily accompanied officers to the police station and that he was not arrested until sometime after he arrived there; and as of that later point in time, the court reasoned, there was sufficient probable cause to arrest him. R. 31-2 at 185.[2] Yet, the court's finding that Monroe was not arrested until after he reached the police station appears to have been inconsistent with the facts stipulated to by the parties, which acknowledged that Monroe had been taken away from his home in handcuffs. R. 31-2 at 134.[3] Although placing an individual in handcuffs does

---

[2] The record is silent as to how much time passed between the point at which Monroe was taken into custody at his home and the point at which the trial court believed Monroe subsequently was arrested at the police station.

[3] Although, as we read the record, the parties' stipulation did not identify precisely when and where Monroe was handcuffed, see R. 31-2 at 134 (prosecutor stipulates that "[Monroe]

(continued...)

not invariably signal that he is under arrest, *see United States v. Smith*, 3 F.3d 1088, 1094-95 (7th Cir. 1993) (coll. cases), "[t]here can be little question that a suspect placed in handcuffs is not free to leave and, for all practical purposes, is in police custody . . . ." *United States v. Wilson*, 2 F.3d 226, 231 (7th Cir. 1993). There appears to be no dispute here that once Monroe was placed in handcuffs, he was under arrest.

But although the trial court's resolution of the motion to suppress hinged on its apparently erroneous understanding of the facts, the appellate court's decision did not. Although the appellate court did not expressly correct the trial court's error as to the timing of the arrest, in the sense of acknowledging and labeling it as error, the court certainly was aware of the mistake, as

---

(...continued)

left the house with [the police] and was subsequently handcuffed"), Monroe's motion to quash represented that the police had placed him in handcuffs "[a]fter leaving [Monroe's] apartment and while still on the porch of the building where he then resided," R. 31-2 at 39, and the parties stipulated that Monroe's mother, if called to testify, would state that "when Solomon was taken away [from his residence], he was taken away in handcuffs." R. 31-2 at 134. (The parties also stipulated that the detectives who went to Monroe's residence would have arrested him and taken him from the house without his consent if he had refused to accompany them. R. 31-2 at 135.) The State itself concedes in the brief it filed with this court that the parties stipulated that "petitioner was led away from his residence in handcuffs." State Br. 15.

Monroe had expressly pointed it out to the court in the direct-appeal briefing. R. 20 at 8, 11. Moreover, the State, in responding to Monroe's appellate argument (which was largely a broadside on the reliability of the witnesses who had implicated Monroe in the attack on Stalker to the police, see R. 20 at 6, 25-27), relied exclusively on information that was known to the police at the time they took Monroe from his residence. R. 20 at 59-65. The appellate court's analysis, in turn, relied on the same information recited in the State's brief, and the court proceeded to reject Monroe's contention that this information was insufficiently trustworthy as proof of his involvement in the attack. R. 20 at 85-91. Monroe himself makes no argument that the appellate court's resolution of the probable cause issue reflected an erroneous understanding of when he was arrested, as the trial court's ruling did. The fact that the appellate court's analysis did not repeat the error is important, because its decision was the final decision of the Illinois courts to reach the merits of Monroe's Fourth Amendment claim, and as such it is that decision which matters for purposes of habeas review. *See*, *e.g.*, *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012), *pet'n for cert. filed*, 81 U.S.L.W. 3421 (U.S. Jan. 16, 2013) (No. 12-885).

Monroe thus received a full and fair hearing on the merits of his Fourth Amendment claim in the Illinois courts. Both the trial court and the Illinois Appellate Court entertained and reached the merits of his claim. The appellate court looked to the appropriate body of case law in resolving the claim, citing state prece-

dents which set forth the relevant Fourth Amendment principles (for example, *People v. Kidd*, 675 N.E.2d 910, 920 (Ill. 1996), which in turn relied on the U.S. Supreme Court's decision in *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225-26 (1964)); and the court correctly set forth the standard for evaluating probable cause. R. 20 at 85-86. Both the trial and appellate courts took the claim seriously, and although the trial court, in resolving the claim, committed a significant error as to the timing of Monroe's arrest, the appellate court's analysis did not repeat the error. Its analysis was consistent with the parties' stipulation that Monroe was handcuffed (and thus arrested) at his home; and the court cited and relied upon evidence which, in its view, established probable cause to believe Monroe had committed a crime and which was known to the police at the time of Monroe's arrest. *Stone* therefore precludes us from reaching the merits of Monroe's Fourth Amendment claim.

B.  Attorney Ineffectiveness

Monroe contends that he was deprived of his Sixth Amendment right to the effective assistance of trial counsel. *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). This claim, as we have said, is based on his counsel's omission to present the testimony of Monroe's brother and sister-in-law, both in support of his motion to suppress his post-arrest statements and at trial. Isabell and Chris Estavia lived on the first floor of the same two-flat building where Monroe resided, and they were present when the police took Monroe into

custody. They would have testified that the police rushed into the building, harassed the Estavias, threatened to harm the family's dog, then forced their way upstairs to the second floor, where Monroe lived with his mother, and ignored Monroe when he asked to contact a lawyer. Notably, the Estavias were not witnesses to the events culminating in Monroe's post-arrest statements at the police station, or to the events underlying the criminal charges against Monroe. Even so, Monroe contends that their testimony would have supported his effort to suppress his post-arrest statements as well as his trial defense, by simultaneously casting doubt on the veracity of police witnesses and bolstering his own credibility as to the events surrounding his post-arrest statements.

To prevail on the claim, Monroe was required to show both that his attorney's performance fell below an objective standard of reasonableness and that there was a reasonable probability that the outcome of the relevant proceedings (here, the motion to suppress his post-arrest statements as well as the trial) would have been different but for his counsel's failings. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *e.g.*, *Gutierrez v. Anglin*, 2013 WL 466074, at *3 (7th Cir. Feb. 8, 2013). As we noted earlier, the Illinois Appellate Court sustained the summary dismissal of this claim, finding that Monroe had satisfied neither of *Strickland*'s two criteria. At the outset, the court pointed out that the Estavias' representation that the police had burst into their home was contradicted by the parties' stipulation, in conjunction with Monroe's motion to quash his

arrest, that the police had remained in the vestibule of the home while waiting for Monroe. R. 20 at 246-47. The Estavias' additional contention that the police had harassed them and threatened their dog was inconsistent with the argument of Monroe's counsel, again in connection with the motion to quash, that police had used "trickery" to get Monroe to accompany them to the police station. R. 20 at 247. In view of these conflicts, the court saw no reason to doubt that counsel made a reasonable strategic decision not to have the Estavias testify in support of the motions to quash and to suppress; nor could Monroe show that he was prejudiced in the sense that the trial court might have credited Monroe's contention that his post-arrest statements were the product of coercion. R. 20 at 247-48. As for the trial, the court noted that the Estavias' testimony would have carried little weight with the jury given their familial connection with Monroe and also given that Monroe himself did not testify about any misconduct that occurred at the time of his arrest; it was therefore reasonable for Monroe's counsel to exclude them from the witness list. R. 20 at 248. Moreover, given what the court deemed to be the overwhelming evidence of Monroe's guilt, the court could discern no prejudice stemming from that decision. R. 20 at 248-49.

Because the state appellate court considered and rejected the ineffectiveness claim on its merits, and correctly looked to *Strickland* as the governing precedent in doing so, *see* R. 20 at 245, Monroe must show

that the court's resolution constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1); *see, e.g., McNary v. Lemke*, 2013 WL 673653, at *7 (7th Cir. Feb. 26, 2013). He cannot satisfy this burden.

The outcome of Monroe's motion to suppress his post-arrest statements turned on what happened at the police station rather than anything that occurred at Monroe's home. Monroe testified that police locked him alone in an interview room, ignored his requests for an attorney, and punched him when he refused their demands to tell them what happened. In denying the motion to suppress, the state trial court credited the State's witnesses over Monroe. R. 31-2 at 232-33. The Estavias, of course were not present and had no knowledge of what occurred at the police station; they could only have testified to what occurred at Monroe's home, before he was taken to the police station. Monroe theorizes that their testimony that the police burst into the home and threatened to kill the family dog, and ignored his request to telephone a lawyer, would have bolstered Monroe's credibility with respect to what occurred at the police station. Although not wholly without force, Monroe's theory is far from compelling given the Estavias' lack of knowledge as to what happened after Monroe was taken from his home, and it falls far short of showing that the outcome of the suppression hearing might have been different had the Estavias testified.

Moreover, as the appellate court pointed out, there were certain credibility issues with the Estavias, given

the conflict between their prospective testimony and (a) the argument of Monroe's counsel at the motion to quash that the police had persuaded Monroe to accompany them through "trickery," and (b) the parties' stipulation at the motion to quash that the police, upon their arrival at Monroe's residence, had waited for him in the building's vestibule. Monroe has a point when he suggests that the court may have made too much of the purported conflict between the Estavias' version of the arrest and his counsel's representation to the trial court that the police had persuaded Monroe to accompany them to the police station by "trickery." As Monroe's brief points out, counsel uttered the word "trickery" once, just before the court ruled on the motion to quash and as the parties were summarizing their positions. R. 31-2 at 184. His counsel went to on say that Monroe had not accompanied the police voluntarily, but instead had "yielded to their force." R. 31-2 at 184-85. And, as we have discussed, there is no dispute that the police placed Monroe in handcuffs immediately outside of his residence, whatever may have occurred inside.[4] So the Estavias' version of events would not necessarily have undermined the basic premise of Monroe's motion to quash, which was that Monroe was arrested at his home. But their testimony would have conflicted head-on with the parties' stipula-

---

[4] Counsel's theory may have been that the police deceived Monroe into leaving his residence voluntarily, only to find himself placed in handcuffs once the police had him outside on the front porch.

tion that the police, upon arriving at the residence, had waited for Monroe in the vestibule. R. 31-2 at 134.

The State certainly would have raised the conflict in opposing the motion to suppress, and that would have been a significant blot on the Estavias' credibility. Under these circumstances, it was not unreasonable for the state court to characterize the failure to call the Estavias as witnesses in support of the suppression motion as a legitimate strategic decision rather than as a lapse in professional judgment that weakened Monroe's motion to suppress.

As to the trial, it is even more difficult to see how the Estavias' testimony might have made any meaningful contribution to the defense case. Again, their testimony would only have related to Monroe's arrest. But the circumstances of his arrest, beyond when and where it took place, were not even mentioned at the trial, notwithstanding the fact that Monroe testified and the circumstances of his arrest certainly were within his knowledge. Monroe renews his assertion that his brother and sister-in-law would have bolstered the credibility of his own testimony that the police had punched him repeatedly at the station, giving the jury reason to credit his contention that his post-arrest statements, including in particular his written statement, were the product of coercion. But, again, the Estavias were not witnesses to what occurred at the police station at the hands of the detectives who interviewed Monroe; they would only have testified as to the alleged misbehavior of altogether different officers in arresting Monroe. And,

as the Illinois Appellate Court recognized, given their familial connection to Monroe, their credibility would have been subject to doubt. In sum, the support that their testimony might have provided to the defense case was too weak to have required a competent attorney to call them as trial witnesses and to show that Monroe was prejudiced by his attorney's omission to do so.

## C. Sufficiency of the evidence

Finally, Monroe challenges the sufficiency of evidence to support his conviction for murder on an accountability theory. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), identifies the pertinent (and familiar) standard: the evidence, construed in the light most favorable to the State, is sufficient to support the conviction so long as any rational trier of fact could find the essential elements of the offense to have been proved beyond a reasonable doubt. As we are considering this claim on collateral review rather than on direct appeal of the conviction, the Antiterrorism and Effective Death Penalty Act engrafts an additional layer of deference onto this inquiry: we may grant relief on this claim only if the Illinois Appellate Court applied the *Jackson* standard unreasonably to the facts of Monroe's case. § 2254(d)(1); *see, e.g.*, *Trejo v. Hulick*, 380 F.3d 1031, 1032 (7th Cir. 2004); *Cabrera v. Hinsley*, *supra*, 324 F.3d at 533-34. (The Illinois Appellate Court did not cite *Jackson*, but it recited the same standard. R. 20 at 91.)

The state appellate court noted that under Illinois law, Monroe could be held accountable for Stalker's murder

so long as Monroe had engaged in a common design
to commit a battery on Stalker and Stalker was stabbed
in furtherance of that design. R. 20 at 93-94. The court
went on to conclude that the evidence was sufficient
to support a finding that Monroe engaged in a com-
mon plan with Thomas and Curry to severely harm
Stalker. The court noted that Monroe and fellow
members of the gang crew had reason to be upset
with Stalker given that members of Stalker's gang had
stolen cocaine from them; Monroe himself had admit-
ted both in his written statement and in his trial testi-
mony that he was angry with Stalker. From the whistle
that summoned Thomas and Jackson to the street,
together with the fact that Monroe punched Stalker and
knocked him to the ground as soon as Thomas appeared,
it was reasonable to infer that Monroe was initiating
a collective plan to retaliate against Stalker for the
sale gone awry, and that Monroe's cohorts, including
Thomas, would be expected to join him. R. 20 at 94-95.
The court acknowledged that Thomas had acted sud-
denly in stabbing Stalker, such that Monroe did not
have time to disassociate himself from that act. None-
theless, the jury, in the court's view, was entitled to
find that Monroe was present when the stabbing
occurred (and not a half block or more away, as Monroe
had testified); and Monroe's own testimony revealed
that he not only fled the scene with Thomas and
the others, but remained with Thomas for a day or two
afterwards. Under those circumstances, Monroe's asser-
tion that he did not know that Thomas had a knife
and did not share his intent to stab Stalker, although
relevant to the jury's assessment of Monroe's culp-

ability, did not preclude the jury from holding Monroe accountable for Stalker's murder pursuant to an accountability theory. R. 20 at 92, 95-96.

Monroe makes three arguments in his effort to show that the Illinois Appellate Court unreasonably applied the *Jackson* standard in finding the evidence underlying his conviction to be sufficient. He argues first that there is no evidence that he had advance knowledge of any plan to harm Stalker: he argues that the incident was essentially a fight that occurred spontaneously, without prior discussion, and that he had no knowledge Thomas might be armed. Second, he notes that gang membership is by itself insufficient to support an inference that Stalker's assailants acted pursuant to a common design: there was no order given to attack Stalker, and Monroe, although he helped initiate the beating, did not hold a position of power within the gang. Third, Monroe contends that his act of fleeing with Thomas and the others, which the Appellate Court cited in support of his conviction, was insufficient to support an inference that he shared Thomas's intent to fatally harm Stalker. In Monroe's view, the evidence establishes only that he had an altercation with Stalker, stepped away when he saw Thomas approach, and subsequently fled the scene with Thomas.

In assessing the reasonableness of the State court's holding as to the sufficiency of the evidence underlying Monroe's conviction, we must of course look to what state law requires in order to convict an individual pursuant to an accountability theory. *See Jackson*, 443 U.S.

at 324 n.16, 99 S. Ct. at 2792 n.16; *Bates v. McCaughtry*, 934 F.2d 99, 102-03 (7th Cir. 1991). The Illinois Criminal Code renders one person accountable for a criminal offense committed by another person when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees or attempts to aid, that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (2012).[5] As the Illinois Appellate Court recognized, that intent is the "cornerstone" of liability under the accountability statute. R. 20 at 92 (citing *People v. Shaw*, 713 N.E.2d 1161, 1173 (Ill. 1998)); *see People v. Perez*, 725 N.E.2d 1258, 1265-66 (Ill. 2000); *People v. Taylor*, 712 N.E.2d 326, 329-30 (Ill. 1999). But the defendant need not necessarily share the principal's intent to commit a particular criminal act in order to be held liable for that act. *See Perez*, 725 N.E.2d at 1265. As relevant here, a defendant's intent to aid in the commission of a crime by another person may be shown by evidence of a common criminal plan or design in which the defendant joined. *Perez*, 725 N.E.2d at 1265; *People v. Thompson*, 730 N.E.2d 118, 123 (Ill. App. Ct. 2000). A defendant's liability under Illinois' common-design rule extends not only to the particular crime that the defendant intends to aid, but also to another offense that the principal commits within the same course of conduct. *People v. McClain*, 645 N.E.2d 585, 589 (Ill. App.

---

[5] The language of the statute has been modified in only minor, non-substantive respects since the offense at issue in this appeal took place in 1996.

Ct. 1995); *see also Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997) (Illinois law); *Brumley v. DeTella*, 83 F.3d 856, 865 (7th Cir. 1996) (Illinois law); *People v. Terry*, 460 N.E.2d 746, 749 (Ill. 1984). Thus, when a defendant intends to aid in the commission of a battery, and that battery culminates in a murder, the defendant's intent to aid the battery may render him liable for the murder, even if he did not share the principal's intent to kill the victim; the defendant's shared intent to commit the battery, and thus to inflict serious harm on the victim, is enough to make him culpable for the murder as well. *Terry*, 460 N.E.2d at 749 (agreeing that common-design rule "does impose liability for murder even though a misdemeanor was only intended"); *see also Brumley*, 83 F.3d at 864-65; *Brennan v. People*, 1854 WL 4728, at *3 (Ill. 1854); *People v. Duncan*, 698 N.E.2d 1078, 1083 (Ill. App. Ct. 1998); *McClain*, 645 N.E.2d at 589; *see also People v. Batchelor*, 665 N.E.2d 777, 781 (Ill. 1996) (murder committed in course of robbery); *People v. Kessler*, 315 N.E.2d 29, 33 (Ill. 1974) (attempted murder committed in course of burglary). So the critical question in this case, as the Illinois Appellate Court recognized, is whether the evidence supports a finding that Monroe intended to aid in the commission of a battery on Stalker.

Granting the State the benefit of all favorable inferences, the evidence was sufficient to support a reasonable inference that there was a common design to beat Stalker, in which Monroe joined. Gang members were angry over the stolen cocaine, as evidenced both

by Monroe's own written post-arrest statement[6] and by the fact that Thomas punched Jackson in the face. The fact that Curry whistled to summon Thomas and Jackson out to the street supports an inference that gang members were being called to action; and the fact that Monroe and Curry, who were escorting Stalker shoulder to shoulder, began to punch him as soon as Thomas appeared supports an inference that the group was going to beat Stalker in retaliation for the conduct of Stalker's fellow gang members. It requires no additional leap to infer that Monroe intended to aid in the commission of a battery upon Stalker: crediting the State's evidence, Monroe threw the first punch, and then as Curry joined in, Monroe walked to the nearby

---

[6] Although the Illinois Appellate Court indicated that Monroe at trial similarly acknowledged his anger over the drug theft, in fact Monroe denied that he was angry over the theft. R. 31-3 at 230; *see also* R. 31-3 at 262-263 ("I'm—to tell you the truth, I—it didn't matter. The eight-ball, it got stolen. It got took. We got robbed. Oh, well, you lose some, you win some. In order to make money, you gone lose money; that's what I was always taught. You gone lose some to make some. So that little $150 worth of cocaine was not a factor to me at that time."). Monroe also denied the truth of his written post-trial statement, in which he stated that he began to beat Stalker because he was angry about the drug theft. R. 31-3 at 229. The only anger that Monroe acknowledged at trial was his anger at Stalker when Stalker took an unprovoked swing at him with the two-by-four. R. 31-3 at 228. Of course, the jury was not required to believe Monroe's trial testimony and was free to credit his written statement instead.

dumpster, retrieved the discarded board, and struck Stalker at least twice with it. Monroe's actions were thus consistent with an intent to inflict serious harm on Stalker. It is noteworthy in that regard that the blows Stalker received to the head were a contributing factor in his death. Jackson, of course, testified that Monroe and Curry together struck Stalker with the board a total of five to seven times; and although Jackson did not see what part of Stalker's body they struck, the jury was not required to believe Monroe's testimony that he only struck Stalker in the leg (although Stalker's leg did show injuries) or that he walked away immediately after he struck those blows and was not present while Curry himself struck Stalker with the board. The jury was likewise not obliged to credit Monroe's testimony that he and Curry had ceased striking Stalker, and were half a block away when Thomas stabbed him; it could have credited Jackson's testimony that Monroe remained standing next to Stalker, and only backed up a foot or so as Thomas approached. And although it was Thomas and Thomas alone who without warning produced a knife and stabbed Stalker, the evidence nonetheless permitted the jury to infer that the stabbing was the culmination of the joint design to commit a battery upon Stalker in retaliation for the actions of Stalker's fellow gang members. That was enough under Illinois law to find Monroe guilty of murder pursuant to an accountability theory. *See Terry*, 460 N.E.2d at 749; *Brennan*, 1854 WL 4728, at *3.

The Illinois Appellate Court did not rely improperly on Monroe's gang membership or his flight together

with Thomas in affirming his conviction. Gang affilia-
tion was a circumstance highly relevant to explaining
why Monroe and the others were angry with Stalker
and why they would want to harm him. That was the
limited sense in which the appellate court cited and
relied upon gang membership. *See People v. Knox*, 608
N.E.2d 659, 663 (Ill. App. Ct. 1993) ("Evidence relating
to the defendant's gang membership or gang-related
activities is admissible to show common purpose or
design, or to provide a motive for an otherwise inex-
plicable act."); *United States v. Butler*, 71 F.3d 243, 251
(7th Cir. 1995) (coll. cases exemplifying proper consid-
eration of gang membership). Nowhere in the court's
decision is there any indication that the court attached
inappropriate significance to Monroe's gang affilia-
tion; the court, for example, did not assume that because
Monroe and Thomas were members of the same gang,
Monroe necessarily intended to aid Thomas's actions.
The court likewise gave appropriate consideration to
Monroe's flight from the attack with Thomas and the
others, along with the fact that he remained with
Thomas for at least another day, as circumstances
which, not by themselves but in conjunction with the
other facts, supported the inference that Thomas's
actions were committed pursuant to a common design
to commit a battery on Stalker and that Monroe had
an intent to aid in the commission of that battery. *See
Perez*, 725 N.E.2d at 1265 (fact that defendant fled
scene and maintained close affiliation with companions
after commission of crime are among factors court may
consider in assessing defendant's accountability) (citing
*People v. Taylor*, 646 N.E.2d 567, 571 (Ill. 1995)).

As Monroe points out, the appellate court may have erred in suggesting that it was he rather than Curry who summoned Thomas and Jackson by whistling, *see* R. 20 at 94 (indicating that "defendant and Curry, while standing with the victim, summoned Thomas . . . with a signal used by them to summon another member's presence," and subsequently stating that "[a] reasonable inference can be drawn from the circumstances that defendant summoned Thomas for the purpose of initiating a battery on Stalker . . . "). Although Jackson's trial testimony did not specify whether it was Curry or Monroe who whistled, see R. 31-3 at 31-32, the State seems to agree that it was Curry, *see* State Br. 12 ("Then the men heard Curry whistle for them to appear."). But that error was not material to the result of the court's analysis. The whistle, as we have said, represented a call to action. Monroe was with Curry when Curry whistled. More to the point, when Jackson and Thomas appeared in response to the whistle, Monroe immediately initiated the attack on Stalker by striking him.

Monroe is also correct in emphasizing that there was no evidence of a discussion among the men that resulted in an express plan to inflict a beating on Stalker in retaliation for what Stalker's cohorts had done. But given the sequence of events, and the actions that Monroe, Curry, Thomas, and (to a lesser extent) Jackson took, the jury could permissibly infer that the men battered Stalker pursuant to a common design, and that Monroe intended to aid in that battery and that he did in fact participate in the battery. And as we have said, Monroe's intent to assist in the commission of a battery upon

Stalker is sufficient, under Illinois law, to render him responsible for the stabbing and murder that Thomas committed in the course of that battery.

## III.

As no constitutional error occurred in the prosecution of Monroe, the district court properly denied Monroe's petition for a writ of habeas corpus. We thank Monroe's appointed counsel for their vigorous efforts on his behalf.

AFFIRMED.